UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL ACTION |
| | * | |
| VERSUS | * | NO. 16-CR-130-JJB |
| | * | |
| JORDAN HAMLETT | * | MARCH 9, 2017 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MOTION TO SUPPRESS
THE HONORABLE JAMES J. BRADY
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:             UNITED STATES ATTORNEY'S OFFICE
                                BY:   RYAN A. REZAEI, ESQ.
                                777 FLORIDA STREET, SUITE 208
                                BATON ROUGE, LOUISIANA 70801

FOR THE DEFENDANT:              THE FISER LAW FIRM, LLC
                                BY:   MICHAEL A. FISER, ESQ.
                                1055 LAUREL STREET
                                BATON ROUGE, LOUISIANA 70802

OFFICIAL COURT REPORTER:        SHANNON L. THOMPSON, CCR.
                                UNITED STATES COURTHOUSE
                                777 FLORIDA STREET
                                BATON ROUGE, LOUISIANA 70801
                                (225) 389-3567


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
COMPUTER-AIDED TRANSCRIPTION SOFTWARE**

```
 1                            INDEX
 2    GOVERNMENT'S WITNESSES:
 3      SAMUEL JOHNSON
 4        DIRECT EXAMINATION BY MR. REZAEI . . . . . . .  4
 5        CROSS-EXAMINATION BY MR. FISER . . . . . . . .  25
 6        REDIRECT EXAMINATION BY MR. REZAEI . . . . . .  32
 7      GLENN JEFF METHVYN, JR.
 8        DIRECT EXAMINATION BY MR. REZAEI . . . . . . .  35
 9        CROSS-EXAMINATION BY MR. FISER . . . . . . . .  38
10    DEFENDANT'S WITNESS:
11      JORDAN HAMLETT
12        DIRECT EXAMINATION BY MR. REZAEI . . . . . . .  42
13        CROSS-EXAMINATION BY MR. FISER . . . . . . . .  47
14
15
16
17
18
19
20
21
22
23
24
25
```

| | |
|---|---|
| 1 | (MARCH 9, 2017) |
| 2 | THE COURT: ALL RIGHT. THE NEXT MATTER THAT THE |
| 3 | COURT WILL ENTERTAIN IS A MOTION TO SUPPRESS IN THE MATTER OF |
| 4 | *UNITED STATES VERSUS JORDAN HAMLETT.* |
| 5 | IS THE GOVERNMENT READY TO PROCEED? |
| 6 | MR. REZAEI: WE ARE, YOUR HONOR. |
| 7 | THE COURT: DEFENDANT READY TO PROCEED? |
| 8 | MR. FISER: WE ARE, YOUR HONOR. |
| 9 | THE COURT: ALL RIGHT. THIS IS A WARRANTLESS |
| 10 | ARREST, AND SO THE GOVERNMENT FRONT AND CENTER. |
| 11 | MR. REZAEI: YES. I JUST WANT TO CLARIFY ONE OF THE |
| 12 | ISSUES, YOUR HONOR. |
| 13 | THE COURT: SIT DOWN. |
| 14 | MR. REZAEI: I JUST WANT TO CLARIFY ONE OF THE |
| 15 | ISSUES, YOUR HONOR. AS I SEE IT, THERE ARE TWO CHALLENGES |
| 16 | HERE. NUMBER ONE IS VOLUNTARINESS OF THE INTERVIEW; WE BEAR |
| 17 | THE BURDEN THERE. |
| 18 | AS FAR AS *MIRANDA* . . . |
| 19 | THE COURT: HE BEARS THE BURDEN. |
| 20 | MR. REZAEI: UNDERSTOOD. THANK YOU. |
| 21 | THE COURT: THAT'S THE LAW. |
| 22 | MR. REZAEI: AT THIS TIME THE UNITED STATES CALLS |
| 23 | SPECIAL AGENT SAM JOHNSON. |
| 24 | (WHEREUPON, **SAMUEL JOHNSON,** HAVING BEEN DULY SWORN, |
| 25 | TESTIFIED AS FOLLOWS.) |

DIRECT EXAMINATION

BY MR. REZAEI:

Q.    SPECIAL AGENT JOHNSON, WILL YOU PLEASE STATE AND
SPELL YOUR NAME FOR THE RECORD.

A.    SAMUEL JOHNSON, S-A-M-U-E-L, J-O-H-N-S-O-N.

Q.    WHO IS YOUR EMPLOYER?

A.    THE TREASURY INSPECTOR GENERAL FOR TAX
ADMINISTRATION.

Q.    WHAT IS YOUR TITLE?

A.    SPECIAL AGENT.

Q.    WHAT ARE YOUR DUTIES AND RESPONSIBILITIES AS A
SPECIAL AGENT WITH TIGTA?

A.    TO CONDUCT INVESTIGATIONS RELATED TO FRAUD, WASTE,
ABUSE AND THREATS AGAINST THE INTERNAL REVENUE SERVICE.

Q.    JUST DESCRIBE YOUR RELEVANT TRAINING, PLEASE.

A.    UPON BEING HIRED, I ATTENDED THE FEDERAL LAW
ENFORCEMENT TRAINING CENTER ACADEMY FOR LAW ENFORCEMENT
OFFICERS.  FOLLOWING THAT, THERE WAS ADDITIONAL ADD-ON COURSES
RELATED SPECIFICALLY TO OUR AGENCY.  AND THEN WE TAKE
CONTINUING PROFESSIONAL EDUCATION COURSES PERIODICALLY AS
YOU'RE EMPLOYED WITH THE AGENCY.

Q.    HOW LONG HAVE YOU BEEN A SPECIAL AGENT?

A.    APPROXIMATELY 11 YEARS.

Q.    ARE YOU FAMILIAR WITH THE DEFENDANT?

A.    I AM.

Q.    HOW SO?

A.    MR. HAMLETT IS THE SUBJECT OF THE INVESTIGATION CONCERNING ATTEMPTED ACCESSES TO PRESIDENT TRUMP'S TAX RETURNS.

Q.    WHEN DID THOSE ATTEMPTED ACCESSES TAKE PLACE?

A.    SEPTEMBER 13, 2016.

Q.    IN CONNECTION WITH YOUR INVESTIGATION, DID YOU INTERVIEW THE DEFENDANT?

A.    YES, SIR.

Q.    WHAT WAS THE DATE OF THAT INTERVIEW?

A.    OCTOBER 27, 2016.

Q.    WHAT WAS THE PURPOSE OF THE INTERVIEW?

A.    THE PURPOSE OF THE INTERVIEW WAS TO DISCUSS THE ATTEMPTED ACCESSES TO OBTAINING PRESIDENT TRUMP'S TAX RETURNS.

Q.    BEFORE WE GET TO THE INTERVIEW ITSELF, I JUST WANT TO GO OVER THE BACKGROUND OF THE DEFENDANT.

HOW OLD IS HE?

A.    THIRTY-ONE.

Q.    WHAT'S HIS EDUCATIONAL BACKGROUND?

A.    HIGH SCHOOL DIPLOMA; I BELIEVE HE HAS ATTENDED SOME COLLEGE COURSES.

Q.    WHAT'S HIS OCCUPATION?

A.    PRIVATE INVESTIGATOR.

Q.    WAS HE A PRIVATE INVESTIGATOR AT THE TIME OF THE INTERVIEW?

1  A.  YES, SIR.

2  Q.  AT THE TIME OF THE INTERVIEW, DID HE OWN OR OPERATE

3  AN INVESTIGATIVE AGENCY?

4  A.  YES, SIR.  AVERLOCK INVESTIGATIONS.

5  Q.  AND JUST DESCRIBE HIS PHYSICAL CHARACTERISTICS,

6  PLEASE.

7  A.  HE'S APPROXIMATELY 6'3", 230, 235 POUNDS, WHITE,

8  MALE.

9  Q.  ALL RIGHT.  RETURNING TO THE INTERVIEW.  WHO

10  ARRANGED THE INTERVIEW WITH JORDAN HAMLETT?

11  A.  WE HAD AN UNDERCOVER AGENT THAT HAD CONTACTED HIM

12  AND ARRANGED FOR HIM TO MEET US AT THE HOTEL.  THE UNDERCOVER

13  AGENT CONTACTED HIM IN REGARDS TO HIRING HIM FOR HIS PRIVATE

14  INVESTIGATION SERVICES.

15  Q.  WHY THE USE OF AN UNDERCOVER AGENT?

16  A.  WE WANTED TO ENSURE THAT THE COLLECTION OF EVIDENCE

17  -- THROUGH THE COURSE OF THE INVESTIGATION, THE ATTEMPTS WERE

18  CONDUCTED TO ACCESS THE ELECTRONIC TAX RECORDS OF MR. TRUMP

19  THROUGH THE DEPARTMENT OF EDUCATION'S FINANCIAL AID WEBSITE.

20  IT WAS IDENTIFIED THAT THE PHONE THAT WE BELIEVED BELONGED TO

21  MR. HAMLETT WAS IN HIS POSSESSION, AND WE WANTED TO ENSURE

22  THAT HE HAD THE PHONE WITH HIM.

23  Q.  WAS OFFICER SAFETY A CONCERN AS WELL?

24  A.  YES, SIR.  ABSOLUTELY.

25  Q.  TELL US ABOUT THAT.

**A.** ANYTIME THERE'S AN UNDERCOVER OPERATION AND A MEETING WITH INDIVIDUALS, OFFICER SAFETY, SAFETY FOR THE GENERAL PUBLIC, SAFETY FOR MR. HAMLETT HIMSELF IS ALWAYS A CONCERN.

**Q.** WHY IN THIS PARTICULAR CASE WAS IT IMPORTANT TO ENSURE THAT NO EVIDENCE WAS DESTROYED?

**A.** WELL, AT THE TIME THAT THESE ATTEMPTS TO MR. TRUMP'S TAX RETURNS OCCURRED, IT WAS DURING THE ELECTION. THERE HAD BEEN DEBATES RECENTLY AT THAT TIME CONCERNING PRESIDENT TRUMP'S NON-RELEASE OF HIS TAX RETURNS AND SOMEONE WAS ATTEMPTING TO GET THE TAX RETURNS.

AT THE TIME IT WAS BELIEVED THAT WITH THE INFORMATION THAT WAS USED TO ATTEMPT TO OBTAIN THE TAX RETURNS, THERE WAS A POSSIBILITY THAT SOMEBODY COULD FIGURE OUT A WAY TO GET THE TAX RETURNS OUT OF THE DATABASE AND RELEASE THEM, SELL THEM, WHATEVER THEY WERE GOING TO DO.

**Q.** WELL, LET ME PUT IT THIS WAY: HOW FAR OUT WAS THE PRESIDENTIAL ELECTION?

**A.** IT WAS WITHIN WEEKS AT THAT POINT. WHEN THE ATTEMPT WAS MADE, IT WAS PROBABLY CLOSE TO A MONTH OUT. AT THE TIME THAT WE DID THE INTERVIEW, IT WAS WITHIN WEEKS OF THE ELECTION.

**Q.** WHEN YOU MET WITH JORDAN HAMLETT, DID YOU REVEAL THE SORT OF NATURE OF THE INVESTIGATION TO HIM?

**A.** YES, SIR, WE DID.

1    Q.    WHERE DID THE INTERVIEW TAKE PLACE?

2    A.    THE EMBASSY SUITES HOTEL ON CONSTITUTION AVENUE IN

3    BATON ROUGE, LOUISIANA.

4    Q.    DESCRIBE FOR US THE INTERIOR OF THE HOTEL AS WELL.

5    A.    THE INTERIOR OF THE HOTEL, WHEN YOU GO IN THROUGH

6    THE FRONT LOBBY DOORS, AS YOU ENTER, TO THE RIGHT IS THE

7    CHECK-IN DESK THERE WHERE YOU WOULD CHECK IN; TO THE LEFT, I

8    BELIEVE, IS A SITTING AREA, AND THEN IT -- YOU WALK IN A

9    LITTLE BIT FURTHER, AND IT OPENS UP INTO A LARGE ATRIUM.

10   Q.    I'M GOING TO SHOW YOU WHAT'S BEEN MARKED AS U.S.

11   EXHIBIT 1.

12         DO YOU RECOGNIZE WHAT'S DEPICTED IN U.S. EXHIBIT 1?

13   A.    YES, SIR, THAT IS THE EMBASSY SUITES.

14   Q.    DOES THAT PHOTOGRAPH FAIRLY AND ACCURATELY DEPICT

15   THE OUTSIDE OF THE EMBASSY SUITES AS IT WAS ON OCTOBER 27TH,

16   2016?

17   A.    YES, SIR, IT DOES.

18   Q.    I'M SHOWING YOU WHAT HAS BEEN MARKED AS U.S. EXHIBIT

19   2.

20         DO YOU RECOGNIZE WHAT IS DEPICTED IN U.S. EXHIBIT 2?

21   A.    YES, SIR.  THAT'S THE EMBASSY SUITES AFTER YOU COME

22   IN THROUGH THE FRONT DOOR THERE; TO THE RIGHT IS THE DESK

23   WHERE YOU WOULD CHECK IN; TO THE LEFT IN THE -- WHERE THE

24   CARPET APPEARS TO BE RED AT OR ORANGE IS KIND OF LIKE A

25   SITTING AREA, AND THEN DOWN THERE WHERE THE LIGHT IS AND IT

1  LOOKS LIKE IT OPENS UP, THAT'S WHAT I'M REFERRING TO AS THE

2  ATRIUM AREA.

3      Q.    DOES THIS FAIRLY AND ACCURATELY DEPICT THE LOBBY AND

4  THE ATRIUM AREA OF THE EMBASSY SUITES AS IT WAS ON OCTOBER 27,

5  2016?

6      A.    YES, SIR, IT DOES, WITH THE EXCEPTION OF THE

7  ACTIVITY THAT WAS GOING ON.  THE DAY THAT WE MET WITH MR.

8  HAMLETT AND CONDUCTED THE INTERVIEW, THERE WAS -- THERE WAS A

9  NUMBER OF PEOPLE NOT ASSOCIATED WITH US GOING IN AND OUT OF

10 THE HOTEL AND THROUGHOUT THE ATRIUM AREA THERE.

11     Q.    IS IT ACCURATE TO SAY THAT DURING THE COURSE OF YOUR

12 INTERVIEW WITH JORDAN HAMLETT, IT WAS BUSY?

13     A.    YES, SIR.

14     Q.    I'M SHOWING YOU NOW WHAT HAS BEEN MARKED AS U.S.

15 EXHIBIT 3.

16          DO YOU RECOGNIZE WHAT'S DEPICTED IN U.S. EXHIBIT 3?

17     A.    YES, SIR, THAT'S THE ATRIUM.  SO FROM THE LAST

18 PICTURE IF YOU'D WALK DOWN TO WHERE THE LIGHT WAS SHOWING,

19 THAT'S THE STAIRS THAT LEAD DOWN TO THE -- WHERE THE ATRIUM

20 AREA WHERE IT OPENS UP AT.

21     Q.    DOES THIS FAIRLY AND ACCURATELY DEPICT THE ATRIUM

22 AREA AS IT WAS ON OCTOBER 27, 2016?

23     A.    YES, SIR, IT DOES, WITH THE EXCEPTION OF THE PEOPLE.

24     Q.    WHAT DO YOU SEE BEHIND THOSE SORT OF RAILINGS THERE,

25 WHAT ARE THESE?

1        **A.**     HOTEL ROOMS.

2        **Q.**     IF YOU LOOK DOWN TOWARDS THE CENTER OF THE PICTURE

3 YOU SEE -- IT LOOKS LIKE ALMOST A DOUBLE GLASS DOOR, WHAT IS

4 THAT AREA BACK THERE?

5        **A.**     THAT BACK THERE, THEY SERVE A BREAKFAST THERE FOR

6 PEOPLE WHO STAY AT THE HOTEL. TO THE LEFT THERE WHERE THE

7 LIGHTS ARE FROM WHERE YOU ARE POINTING WOULD BE THE AREA WHERE

8 YOU COULD GO ORDER OMELETS OR GET A HOT BREAKFAST, AND TO THE

9 RIGHT THERE KIND OF WHERE -- TO THE RIGHT OF DOWN THERE WHERE

10 YOU POINTED, THEY HAVE A DRINK STATION THAT HAS FOUNTAIN

11 DRINKS, COFFEE, THINGS -- WATER, THINGS OF THAT NATURE.

12        **Q.**     I'M SHOWING YOU WHAT'S BEEN MARKED AS U.S. EXHIBIT

13 5.

14        DO YOU RECOGNIZE WHAT'S DEPICTED IN U.S. 5?

15        **A.**     YES, SIR, THAT'S STANDING AT THE TOP OF THE STAIRS

16 THERE IN THE ATRIUM AREA. THERE IS SOME TABLES LOCATED THERE

17 TO THE RIGHT AND THAT IS APPROXIMATELY WHERE WE DID THE

18 INTERVIEW WITH MR. HAMLETT.

19        **Q.**     DOES U.S. EXHIBIT 5 FAIRLY AND ACCURATELY DEPICT THE

20 AREA WHERE YOU APPROXIMATELY DID THE INTERVIEW WITH JORDAN

21 HAMLETT?

22        **A.**     YES, SIR.

23        **Q.**     AND, FINALLY, I'M SHOWING YOU WHAT HAS BEEN MARKED

24 AS U.S. EXHIBIT 6.

25        DO YOU RECOGNIZE WHAT'S DEPICTED IN U.S. EXHIBIT 6?

1    **A.**    YES, SIR.   AND THAT SHOWS THE AREA WHERE WE

2    INTERVIEWED MR. HAMLETT.   WE WOULD HAVE SAT IN EITHER ONE OF

3    THESE FIRST TWO TABLES CLOSEST TO THE BLUE PLANTERS THERE WITH

4    THE BRICKS, THE OUTERMOST TABLES THERE.

5    **Q.**    YOU'RE AT ONE OF THE ROUND TABLES AS OPPOSED TO THE

6    SQUARE TABLES?

7    **A.**    YES, SIR.

8    **Q.**    ALL RIGHT.   I BELIEVE I ASKED THIS, BUT DOES THIS

9    FAIRLY AND ACCURATELY DEPICT THE AREA WHERE YOU INTERVIEWED

10   JORDAN HAMLETT?

11   **A.**    YES, SIR.

12   **MR. REZAEI:**   THE UNITED STATES AT THIS TIME OFFERS

13   INTO THE RECORD U.S. EXHIBITS 1, 2, 3, 5, AND 6.

14   **MR. FISER:**   NO OBJECTION, YOUR HONOR.

15   **THE COURT:**   THEY ARE ADMITTED.

16   BY MR. REZAEI:

17   **Q.**    ALL RIGHT.   BACK TO THE INTERVIEW.   WHERE DID YOU

18   FIRST MEET WITH JORDAN HAMLETT ON OCTOBER 27, 2016?

19   **A.**    WHEN MR. HAMLETT CAME INTO THE HOTEL, HE CAME DOWN

20   TO THE -- HE CAME THROUGH THE LOBBY AREA THERE.   BEFORE HE GOT

21   TO THE STAIRS TO COME DOWN TO THE ATRIUM, MYSELF AND FEDERAL

22   BUREAU OF INVESTIGATIONS SPECIAL AGENT GLENN METHVYN

23   APPROACHED HIM AND IDENTIFIED OURSELVES AND MET HIM IN THAT

24   AREA.

25   **Q.**    WHAT DID YOU SAY ABOUT THE AGENCIES THAT YOU WORKED

1    FOR?

2         A.    I ADVISED HIM I WAS WITH THE TREASURY INSPECTOR

3    GENERAL FOR TAX ADMINISTRATION.    I SHOWED HIM MY CREDENTIALS,

4    IDENTIFIED MYSELF AS BEING A LAW ENFORCEMENT OFFICER WITH MY

5    CREDENTIALS.    SPECIAL AGENT METHVYN DID THE SAME THING.

6         Q.    WHAT DID YOU, THEN, NEXT ASK HIM ABOUT DOING AN

7    INTERVIEW?

8         A.    WE ADVISED HIM THAT WE WOULD LIKE TO SPEAK WITH HIM,

9    WE HAD SOMETHING THAT WAS SENSITIVE, AN IMPORTANT MATTER THAT

10   WE WOULD LIKE TO SPEAK WITH HIM ABOUT.    HE WAS ADVISED THAT WE

11   HAD A HOTEL ROOM AVAILABLE AND THAT IF HE WOULD LIKE, WE COULD

12   GO UP TO THE HOTEL ROOM AND SPEAK WITH HIM, OR IF HE WANTED TO

13   STAY DOWN IN THE LOBBY AREA, WE WOULD MEET WITH HIM DOWN IN

14   THE LOBBY AREA IF HE WOULD LIKE TO SPEAK WITH US ABOUT IT.

15        Q.    AND WHEN YOU ASKED HIM WHETHER HE WANTED TO BE

16   INTERVIEWED IN A PRIVATE HOTEL ROOM OR ELSEWHERE, WHAT DID HE

17   SAY?

18        A.    HE ELECTED FOR TO US TO CONDUCT THE INTERVIEW

19   DOWNSTAIRS IN THE LOBBY AREA.

20        Q.    AND WHAT WAS HIS DEMEANOR AT THE TIME WHEN YOU FIRST

21   MET HIM?

22        A.    HE WAS NERVOUS.    AND MY EXPERIENCE AS AN AGENT, I

23   MEAN, HE DIDN'T APPEAR OVERLY NERVOUS AND HE DIDN'T START

24   CRYING OR ANYTHING LIKE THAT, BUT HE DID APPEAR NERVOUS WHEN

25   WE HAD APPROACHED HIM.

1   Q.   HOW DOES HIS DEMEANOR CHANGE DURING THE COURSE OF
2   THE INTERVIEW?

3   A.   HE DID SEEM TO RELAX.  HE SEEMED MORE COMFORTABLE
4   WITH US.  THE INTERVIEW WE CONDUCTED WITH HIM IT WAS
5   CONVERSATIONAL, IT WAS A FRIENDLY INTERVIEW THROUGHOUT THE
6   ENTIRE PROCESS.

7   Q.   WHAT WERE Y'ALL WEARING WHEN YOU MET WITH JORDAN
8   HAMLETT?

9   A.   MYSELF AND SPECIAL AGENT METHVYN BOTH WORE A SUIT,
10  COAT AND TIE.

11  Q.   WERE YOU ARMED?

12  A.   YES, SIR, I WAS.

13  Q.   HOW VISIBLE WAS THAT FIREARM?

14  A.   I DID NOT REMOVE MY JACKET SO I DON'T KNOW THAT HE
15  RECOGNIZED OR SAW MY FIREARM OR WHATNOT, BUT MY FIREARM WAS ON
16  MY HIP AND ALONG WITH MY BELT BADGE IDENTIFYING THAT I AM A
17  LAW ENFORCEMENT.

18  Q.   BUT AT NO POINT DID YOU DRAW THAT WEAPON OR POINT
19  THAT WEAPON?

20  A.   NO, SIR.

21  Q.   AND SAME QUESTIONS AS TO SPECIAL AGENT JEFF METHVYN?

22  A.   NO, SIR.

23  Q.   DID YOU PAT DOWN THE DEFENDANT?

24  A.   NO, SIR.

25  Q.   WHAT DID YOU DO INSTEAD?

1    A.    WE ASKED HIM IF HE WAS ARMED.

2    Q.    AND WHAT DID HE SAY?

3    A.    HE SAID HE WAS NOT.

4    Q.    ESSENTIALLY TOOK HIM AT HIS WORD?

5    A.    YES, SIR.

6    Q.    ALL RIGHT.  SO AFTER YOU INTRODUCED YOURSELVES, WHAT

7    HAPPENED NEXT?

8    A.    WE ASKED HIM TO COME DOWN AND SPEAK WITH US.  HE

9    ELECTED TO COME DOWN AND SPEAK WITH US.  WE WENT DOWN AND SAT

10   DOWN AT THAT TABLE, AND WE BEGAN TO INTERVIEW HIM.  THE

11   INITIAL QUESTIONS THAT WE ASKED HIM WERE WAS HE FAMILIAR WITH

12   ANONYMOUS, WHICH IS AN INTERNET HACKING GROUP.

13        AT THAT TIME ANONYMOUS HAD BEEN ESTABLISHED AS

14   PEOPLE THAT HAVE RELEASED SOME OF PRESIDENT TRUMP'S PERSONAL

15   IDENTIFYING INFORMATION AND THINGS OF THAT NATURE.

16        AT THE TIME THAT THE INVESTIGATION WAS GOING ON,

17   THIS WAS DURING THE ELECTION AND THE INFORMATION THAT WE HAD

18   OBTAINED AT THAT TIME WAS THAT MR. HAMLETT WAS A PRIVATE

19   INVESTIGATOR, AND WE'RE NOT SURE AS TO EVERYTHING THAT HE MAY

20   OR MAY NOT BE AFFILIATED WITH DURING THE -- AT THIS POINT IN

21   TIME WHEN WE ELECT TO INTERVIEW HIM.  SO --

22   Q.    GO AHEAD.

23   A.    WE INITIATED THE QUESTION BEGINNING BY ASKING HIM

24   ABOUT ANONYMOUS, THE HACKING GROUP, AND THAT TYPE OF STUFF.

25   Q.    HOW CONFRONTATIONAL WERE Y'ALL?

1    **A.**    THE INTERVIEW WAS NOT CONFRONTATIONAL AT ANY POINT

2    DURING THE INTERVIEW.  IT WAS A FRIENDLY CONVERSATION.  WE

3    SPOKE IN LOWER VOICES BECAUSE THERE WAS A NUMBER OF PEOPLE

4    PASSING BY AND THE INFORMATION THAT WE'RE DISCUSSING AT THIS

5    TIME RELATES DIRECTLY TO PRESIDENT -- AT THAT TIME PRESIDENT

6    -- PRESIDENTIAL CANDIDATE TRUMP AND HIS TAX RETURNS AND THE

7    ATTEMPTED ACCESSES TO OBTAIN HIS TAX RETURNS.

8    **Q.**    AT SOME POINT DURING THE COURSE OF THE CONVERSATION

9    THAT Y'ALL ARE HAVING, DOES PRESIDENT TRUMP'S TAX RETURNS COME

10   UP?

11   **A.**    YES, SIR.  AFTER WE BEGAN THE INTERVIEW, WE HAD

12   ASKED HIM ABOUT ANONYMOUS, AND HE HAD PROVIDED WHAT HE KNEW

13   ABOUT THEM.  WE TALKED ABOUT HIS BACKGROUND SOME, AS A PRIVATE

14   INVESTIGATOR, THE DIFFERENT TYPES OF CASES THAT HE HAD

15   INVESTIGATED, AND WE HAD ASKED HIM IF HE WAS FAMILIAR WITH THE

16   FINANCIAL AID WEBSITE.

17          AND THEN WE ADVISED HIM THAT SOMEONE HAD A GENIUS

18   IDEA TO ATTEMPT TO ACCESS PRESIDENT TRUMP'S TAX RETURNS

19   THROUGH THE FINANCIAL AID WEBSITE.  AT THAT POINT, MR. HAMLETT

20   ACKNOWLEDGED THAT IT WAS HIM.  HE WAS IN AGREEMENT THAT IT WAS

21   A GENIUS IDEA TO ATTEMPT TO GET MR. TRUMP'S RETURNS THROUGH

22   THAT SITE.

23   **Q.**    HOW QUICK WAS HE TO VOLUNTEER THAT IT WAS HIM WHO

24   TRIED TO OBTAIN THIS INFORMATION?

25   **A.**    IT WAS IMMEDIATE.  THERE WAS NO -- WE DIDN'T ACCUSE

1 HIM OF ANYTHING AT THAT POINT. WE WERE JUST BEGINNING TO
2 EXPLAIN WHAT HAD HAPPENED, AND HE ACKNOWLEDGED THAT IT WAS HIM
3 THAT HAD DONE IT.

4     Q. WHAT DID HE SOUND LIKE AS HE WAS DESCRIBING TO YOU
5 THE ATTEMPTS TO OBTAIN THE INFORMATION?

6     A. HE SOUNDED SOMEWHAT -- I WOULD DESCRIBE IT -- AS
7 PROUD. I MEAN, HE ACKNOWLEDGED THAT HE THOUGHT OF THAT IDEA;
8 THAT IT WAS HIM THAT HAD MADE THE ACCESS TO IT, AND WE HAD NOT
9 -- WE HAD NOT SAID ANYTHING TO HIM, AS FAR AS MAKING AN
10 ACCUSATION OR ACCUSING HIM OF MAKING THE ACCESS AT THAT POINT.

11     Q. WELL, DID YOU MAKE ANY ACCUSATIONS AT ANY POINT
12 DURING THE COURSE OF THE INTERVIEW?

13     A. NO, SIR. THE INTERVIEW WAS CONVERSATIONAL AND
14 FRIENDLY. AFTER THAT POINT WE KIND OF ASKED HIM TO EXPLAIN
15 WHAT HAD HAPPENED AND HOW HE DID IT. HE WENT THROUGH THE
16 PROCESS. WE WOULD ASK QUESTIONS AND HE WOULD ANSWER THE
17 QUESTIONS, AND IT WAS A MORE OF A CONVERSATION-TYPE FRIENDLY
18 INTERVIEW.

19     Q. DID IT SEEM TO YOU AT ANY POINT THAT HE DIDN'T
20 UNDERSTAND Y'ALL'S QUESTIONS?

21     A. NO, SIR, HE ANSWERED THE QUESTIONS. HE WAS CLEAR
22 ABOUT ANSWERING THE QUESTIONS. IT DIDN'T SEEM LIKE THAT ANY
23 POINT FROM BASED ON THE TRAINING THAT I'VE RECEIVED, THAT HE
24 WAS TRYING TO BE DECEPTIVE IN WHAT HE WAS TELLING US OR
25 ANYTHING OF THAT NATURE.

1    **Q.**    DID HE BECOME UPSET, ANIMATED, OR USE HARSH WORDS AT
2    ANY POINT?

3    **A.**    NO, SIR.  HE NEVER RAISED HIS VOICE.  HE NEVER
4    CURSED OR ANYTHING OF THAT NATURE.

5    **Q.**    AND WHAT ABOUT YOU AND SPECIAL AGENT METHVYN; AT ANY
6    POINT, DID YOU BECOME ANIMATED OR ANYTHING OF THAT NATURE?

7    **A.**    NO, SIR.  AT NO POINT DID WE CURSE, RAISE OUR VOICE,
8    OR ANYTHING OF THAT.  THE CONVERSATION WAS FRIENDLY.  IT WAS
9    MORE OF A CONVERSATION THAT WE HAD WITH HIM.

10    **Q.**    WELL, WHY DON'T YOU COMPARE THIS INTERVIEW TO OTHER
11    INTERVIEWS THAT YOU'VE DONE IN THE PAST OVER THE COURSE OF
12    YOUR CAREER?

13    **A.**    THERE'S TIMES THAT WHEN YOU INTERVIEW SUBJECTS OR
14    WHATNOT, MANY TIMES PEOPLE WILL MINIMIZE, MAKE DENIALS OF WHAT
15    THEY HAVE DONE OR WHAT HAS TRANSPIRED OR WHATNOT.  MANY TIMES
16    YOU WILL HAVE TO PRODUCE EVIDENCE AND SET THE EVIDENCE OUT IN
17    FRONT OF THEM AND DEMONSTRATE THAT YOU KNOW THAT THEY WERE
18    RESPONSIBLE FOR WHAT HAD OCCURRED OR WHATNOT.  NONE OF THAT
19    HAPPENED IN THIS TYPE OF INTERVIEW.

20    A LOT OF TIMES YOU'LL HAVE TO -- PEOPLE WILL MAKE
21    DENIALS.  YOU'LL HAVE TO TELL THEM AGAIN AND AGAIN THAT YOU
22    KNOW THAT THEY WERE RESPONSIBLE FOR IT AT TIMES BEFORE THEY'LL
23    ACCEPT RESPONSIBILITY.  OR THEY'LL MINIMIZE IT IN WAYS AND YOU
24    HAVE TO PRODUCE EVIDENCE TO SHOW THAT THEY WERE INVOLVED WITH
25    IT, AND THEY KNOWINGLY AND WILLINGLY PARTICIPATED IN WHAT IT

1 | IS THAT YOU ARE TALKING ABOUT.

2 |     **Q.**   WHY DON'T YOU IN A SENSE JUST DESCRIBE THE OVER-ALL

3 | ATMOSPHERE OF THIS CONVERSATION.

4 |     **A.**   IT WAS FRIENDLY.  IT WAS A CONVERSATION.  IT WAS

5 | ALMOST LIKE FRIENDS TALKING IN A SENSE.  OUR VOICES WERE

6 | LOWERED.  WE WERE ALL THREE SITTING AT THE TABLE.  THERE WAS

7 | NO ANIMOSITY AT ALL AT ANY POINT DURING THE INTERVIEW THAT I

8 | OBSERVED.

9 |     **Q.**   WHAT BREAKS, IF ANY, DURING THE COURSE OF THE

10 | INTERVIEW DID THE DEFENDANT TAKE?

11 |     **A.**   WE HAD ADVISED MR. HAMLETT THAT IF HE WANTED TO TAKE

12 | ANY BREAKS, HE WAS WELCOME TO TAKE A BREAK OR USE THE RESTROOM

13 | OR WHATNOT.  WE DID TAKE A BREAK.  WE TOOK TWO BREAKS DURING

14 | THE COURSE OF THE INTERVIEW.  DURING ONE OF THOSE BREAKS MR.

15 | HAMLETT WENT OUTSIDE AND -- OUTSIDE OF THE HOTEL AND SMOKED A

16 | CIGARETTE.  AND DURING THE SECOND BREAK, HE WENT AND PICKED UP

17 | A USB CORD FOR HIS CELLULAR PHONE AND SMOKED A CIGARETTE

18 | DURING THAT BREAK, TOO.

19 |     **Q.**   AS FAR AS THE FIRST SMOKE BREAK, ABOUT WHEN DID THAT

20 | TAKE PLACE?

21 |     **A.**   I ESTIMATE THAT IT WAS ABOUT AN HOUR, AN HOUR INTO

22 | THE INTERVIEW.

23 |     **Q.**   DURING THAT FIRST SMOKE BREAK, WHERE WERE YOU?

24 |     **A.**   I REMAINED IN THE HOTEL.  I WAS IN THE ATRIUM AREA.

25 |     **Q.**   AND DURING THE SECOND SMOKE BREAK, WHERE WERE YOU?

1     **A.**   I WAS IN THE ATRIUM AREA.  I MAY HAVE WENT TO THE

2  RESTROOM.  I CAN'T REMEMBER SPECIFICALLY, BUT I DID NOT LEAVE

3  THE HOTEL.

4     **Q.**   BETWEEN THE FIRST SMOKE BREAK AND THE SECOND SMOKE

5  BREAK, WHAT WAS THE CONVERSATION LIKE?

6     **A.**   IT REMAINED CONVERSATIONAL.  IT WAS A FRIENDLY

7  CONVERSATION THROUGHOUT THE PROCESS.

8     **Q.**   WHAT, IF ANYTHING, DID JORDAN HAMLETT SAY ABOUT

9  AGREEING TO DO THE INTERVIEW OR TRYING TO HIDE SOMETHING?

10     **A.**   AT THE END OF THE INTERVIEW, MR. HAMLETT HAD TOLD US

11  THAT HE WAS AGREEING -- HE HAD AGREED TO DO THE INTERVIEW.  HE

12  WANTED TO FULLY COOPERATE WITH LAW ENFORCEMENT, AND HE WAS

13  TRYING TO DO EVERYTHING HE COULD TO COOPERATE.

14     **Q.**   WAS THE DEFENDANT IN ANY KIND OF RESTRAINT AT ANY

15  POINT DURING THE COURSE OF THE INTERVIEW?

16     **A.**   NO, SIR.

17     **Q.**   NO HANDCUFFS?

18     **A.**   NO, SIR.

19     **Q.**   WAS THERE ANYTHING OBSTRUCTING HIS ABILITY TO HIS

20  INGRESS OR EGRESS?

21     **A.**   NO, SIR.

22     **Q.**   ALL RIGHT.  WERE THERE ANY LOCKED DOORS IN THAT

23  ATRIUM AREA?

24     **A.**   NOT THAT I KNOW OF.

25     **Q.**   WAS THIS INTERVIEWED RECORDED?

**A.**   NO, SIR.

**Q.**   WHY NOT?

**A.**   HE WAS NOT IN CUSTODY.  OUR POLICY WOULD REQUIRE THAT IF WE WERE MAKING AN ARREST OR HAD ARRESTED HIM, THAT BEFORE THE INITIAL APPEARANCE, THAT WE WOULD TRY TO MAKE AN ATTEMPT TO GET HIM TO A DETENTION FACILITY AND RECORD THE INTERVIEW.  BECAUSE IT WAS NOT A CUSTODIAL INTERVIEW, WE WERE NOT REQUIRED TO RECORD THE INTERVIEW.

**Q.**   WHAT INTENTION THAT DAY DID YOU HAVE WITH RESPECT TO ARRESTING THE DEFENDANT?

**A.**   WE HAD NO INTENTIONS OF ARRESTING HIM ON THAT DATE.

**Q.**   ASIDE FROM SHAKING THE DEFENDANT'S HAND, WHAT PHYSICAL CONTACT DID YOU OR SPECIAL AGENT METHVYN MAKE WITH THE DEFENDANT?

**A.**   I HAD NONE AND I'M NOT AWARE OF ANY ADDITIONAL CONTACT THAT SPECIAL AGENT METHVYN HAD WITH HIM.

**Q.**   DURING THE COURSE OF THE INTERVIEW, DID YOU TRY TO PRESSURE HIM OR COERCE HIM IN SOME ILLEGITIMATE WAY?

**A.**   NO, SIR.

**Q.**   MAKE ANY PROMISES?

**A.**   NO, SIR.

**Q.**   TRY TO INTIMIDATE HIM?

**A.**   NO, SIR.

**Q.**   TOWARDS THE END OF THE INTERVIEW, WHAT QUESTIONS DID THE DEFENDANT ASK ABOUT POSSIBLE CHARGES?

**A.** AT THE END OF THE INTERVIEW, HE WAS ADVISED THAT HE HAD VIOLATED FEDERAL LAW AND THAT WE WERE STILL COLLECTING INFORMATION TO MAKE A DETERMINATION. HE QUESTIONED WHAT FEDERAL LAWS THAT HE MAY HAVE VIOLATED OR WHATNOT, AND HE QUESTIONED HOW THE LEGAL PROCESS WOULD WORK.

**Q.** BUT THE CONVERSATION WAS STILL FRIENDLY AT THIS POINT?

**A.** YES, SIR, IT WAS CONVERSATIONAL, FRIENDLY, LOWERED VOICES. HE DIDN'T SEEM UPSET. HE DIDN'T GET UPSET. THERE WERE NO RAISED VOICES.

**Q.** DID YOU INTERVIEW THE DEFENDANT ON A SECOND OCCASION?

**A.** YES, SIR.

**Q.** WHEN DID THAT TAKE PLACE?

**A.** OCTOBER 31, 2016.

**Q.** YOU'RE TALKING FOUR DAYS LATER?

**A.** YES, SIR.

**Q.** WHO WAS PRESENT FOR THAT INTERVIEW?

**A.** MYSELF AND SPECIAL AGENT JOHN ROGER KIRBY WITH THE TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION.

**Q.** HOW WAS THAT SECOND INTERVIEW ARRANGED?

**A.** SPECIAL AGENT KIRBY CONTACTED MR. HAMLETT BY TELEPHONE.

**Q.** AND WHAT DID HE INVITE THE DEFENDANT TO DO?

**A.** HE ASKED TO MEET WITH THE DEFENDANT, AND THE

1  DEFENDANT ADVISED HE WOULD MEET US IN THE PARKING LOT AT THE
2  RESIDENCE WHERE HE LIVED.

3     Q.    SO HE VOLUNTARILY CAME TO YOU?

4     A.    YES, SIR.

5     Q.    HE WAS ELSEWHERE AT THE TIME OF THE TELEPHONE CALL?

6     A.    YES, SIR.  FROM WHAT I RECOLLECT, HE WAS COMING BACK
7  FROM LAFAYETTE, AND HE HAPPENED TO BE FAIRLY CLOSE TO HIS
8  RESIDENCE AT THAT TIME, AND WE WERE ALREADY IN THAT AREA, AND
9  HE AGREED THAT HE WOULD MEET US THERE AT HIS RESIDENCE.

10    Q.    FOLLOWING THAT SECOND INTERVIEW, WHAT DID THE
11 DEFENDANT SEND TO YOU OR AN AGENT OF TIGTA?

12    A.    SPECIAL AGENT KIRBY RECEIVED TWO E-MAILS FROM MR.
13 HAMLETT HOURS AFTER WE CONDUCTED THAT INTERVIEW ON OCTOBER 31,
14 2016.

15    Q.    DID YOU OR SPECIAL AGENT KIRBY ASK THE DEFENDANT TO
16 SEND THOSE E-MAILS?

17    A.    NO, SIR, WE DID NOT.

18    Q.    WHY DID HE SEND THOSE E-MAILS, IF YOU KNOW?

19    A.    IN MY OPINION, HE SENT THEM TRYING TO SEND MORE
20 JUSTIFICATIONS FOR WHY HE DID WHAT HE DID.

21    Q.    BUT YOU DIDN'T ASK HIM TO SEND THOSE E-MAILS?

22    A.    NO, SIR, WE DID NOT.

23    Q.    I WANT TO SHOW YOU WHAT'S BEEN MARKED AS U.S.
24 EXHIBIT 8.

25          DO YOU RECOGNIZE U.S. EXHIBIT 8?

1    A.    YES, SIR, I DO.    THAT IS THE FIRST E-MAIL THAT WAS

2    SPENT TO SPECIAL AGENT KIRBY.

3    Q.    AND HOW DO YOU KNOW THAT THIS WAS THE E-MAIL THAT

4    JORDAN HAMLETT SENT TO SPECIAL AGENT KIRBY?

5    A.    BASED ON THE E-MAIL ADDRESS IN THIS ONE, IT DOESN'T

6    FULLY DISPLAY THE FULL E-MAIL ADDRESS, BUT MR. HAMLETT HAD

7    PROVIDED US HIS E-MAIL ADDRESS BEFORE AT THE INTERVIEW, AND I

8    KNOW THAT THAT IS SPECIAL AGENT KIRBY'S E-MAIL ADDRESS AS

9    WELL.

10    Q.    AND THIS TIME HERE, CAN YOU READ THAT FOR US?

11    A.    IT STATES:  MONDAY, OCTOBER 31, 2016, 1:07 AND 5

12    SECONDS P.M.

13    Q.    AND THIS IS AFTER YOUR INTERVIEW; IS THAT RIGHT?

14    A.    YES, SIR, THAT IS AFTER THE INTERVIEW.

15    Q.    AND AT THE BOTTOM WILL YOU PLEASE READ WHAT I'VE

16    POINTED TO THERE, THIS RIGHT HERE (INDICATING).

17    A.    "THANKS, JORDAN HAMLETT."

18    Q.    I'M NOW SHOWING YOU WHAT'S BEEN MARKED AS U.S.

19    EXHIBIT 9.

20         DO YOU RECALL U.S. EXHIBIT 9?

21    A.    YES, SIR, I DO.

22    Q.    WHAT IS U.S. EXHIBIT 9?

23    A.    THIS IS THE SECOND E-MAIL THAT WAS SENT TO SPECIAL

24    AGENT KIRBY.

25    Q.    IS IT TRUE THAT IT LOOKS LIKE THE FIRST E-MAIL FROM

1    1:06 P.M. WAS FORWARDED IN THE SECOND E-MAIL; IS THAT RIGHT?

2         A.    YES, SIR, IT DOES.

3         Q.    HOW DO YOU KNOW THAT THIS IS THE SECOND E-MAIL IS

4    SOMETHING THAT WAS E-MAILED BY JORDAN HAMLETT TO ROGER KIRBY?

5         A.    WELL, BASED ON THE E-MAIL ADDRESS AND THAT IT WAS

6    FORWARDED AND IT HAD THE ADDITIONAL -- HE ADDED ON TO THE

7    FIRST E-MAIL THAT WAS SENT, AND IT WAS FORWARDED TO SPECIAL

8    AGENT KIRBY.

9              MR. REZAEI:  AT THIS TIME THE UNITED STATES OFFERS

10   U.S. EXHIBITS 8 AND 9.

11             THE COURT:  IS THERE ANY --

12             MR. FISER:  NO OBJECTION, YOUR HONOR.

13             THE COURT:  ALL RIGHT.  EIGHT AND 9 ARE ADMITTED.

14   BY MR. REZAEI:

15        Q.    AND DID A THIRD INTERVIEW TAKE PLACE WITH JORDAN

16   HAMLETT?

17        A.    YES, SIR, IT DID.

18        Q.    AND DID THAT OCCUR ON NOVEMBER 8, 2016?

19        A.    YES, SIR, IT DID.

20        Q.    DURING THAT FIRST INTERVIEW, DID YOU AT ANY POINT

21   SAY HE COULDN'T LEAVE?

22        A.    NO, SIR, I DID NOT.

23        Q.    THANK YOU, SPECIAL AGENT JOHNSON.  THAT'S ALL I

24   HAVE.

25             THE COURT:  MR. FISER, ANY CROSS, SIR?

1    MR. FISER:  I DO, YOUR HONOR.

2                    CROSS-EXAMINATION

3    BY MR. FISER:

4        Q.   GOOD AFTERNOON, SPECIAL AGENT JOHNSON.  I'M MICHAEL

5    FISER.  WE HAVE MET BEFORE.

6        A.   YES, SIR.

7        Q.   THANK YOU FOR BEING HERE.

8             THE OCTOBER 27TH MEETING, YOU SAID YOU HAD TO TRICK

9    MR. HAMLETT TO APPEAR FOR THAT MEETING?

10       A.   NO, SIR, I DID NOT SAY TRICK.  WE CONDUCTED AN

11   UNDERCOVER OPERATION TO HAVE HIM COME THERE.  THAT WASN'T THE

12   SOLE PURPOSE OF THE UNDERCOVER OPERATION.

13       Q.   WHAT WAS THE NATURE -- CAN YOU DESCRIBE THE NATURE

14   OF THE SCHEME BY WHICH YOU OBTAINED MR. HAMLETT'S PRESENCE AT

15   THE HOTEL?

16       A.   WE HAD AN UNDERCOVER AGENT CONTACT MR. HAMLETT ON --

17   BY CELLULAR PHONE TO HIRE HIM AND SOLICIT TO HIRE HIM FOR

18   PRIVATE INVESTIGATOR SERVICES.  AND SO THERE WAS A MEETING

19   ARRANGED FOR HIM TO COME DOWN AND MEET WITH THE UNDERCOVER

20   AGENT TO DISCUSS THE HIRING OF HIM FOR THEIR -- FOR HIS

21   SERVICES.

22       Q.   AND YOU DISAGREE WITH MY DESCRIPTION OF THAT AS A

23   TRICK?

24       A.   WE CALL IT AS AN UNDERCOVER OPERATION AND WAS DONE

25   TO COLLECT THE INFORMATION AND TO OBTAIN THE CELLULAR PHONE

1 AND TO CONDUCT THE INTERVIEW OF MR. HAMLETT.

2     Q.    WHY DIDN'T YOU SIMPLY JUST CALL HIM AND ASK HIM IN

3 FOR AN INTERVIEW?

4     A.    WELL, THERE WERE A NUMBER OF FACTORS AT PLAY AT THIS

5 TIME, AND THE SENSITIVITY OF THE INVESTIGATION WITH HIM BEING

6 A PRIVATE INVESTIGATOR AND THE ELECTION THAT WAS GOING ON AT

7 THE TIME, THERE WAS THOUGHTS THIS COULD BE SOMETHING THAT

8 WOULD AFFECT THE ELECTION IF THE INFORMATION HAD BEEN RECEIVED

9 AND THE -- HE HAD THE ACTUAL PERSONAL IDENTIFYING INFORMATION

10 OF PRESIDENT TRUMP AT THAT TIME AND HAD ATTEMPTED THE ACCESSES

11 OF IT. IN ADDITION TO THAT, HE WAS A PRIVATE INVESTIGATOR.

12 HE HAD THE CELLULAR DEVICE, HE HAD POTENTIAL COMPUTERS, THINGS

13 OF THAT NATURE, AND WE WANTED TO ENSURE THAT WE CAPTURED ALL

14 OF THAT STUFF.

15       WE ALSO WERE NOT AWARE OF WHETHER HE WAS WORKING

16 WITH SOMEBODY, OR IF SOMEBODY HAD HIRED HIM TO ATTEMPT TO

17 ACCESS PRESIDENT TRUMP'S TAX RETURNS FOR RELEASE, OR IF HE HAD

18 DONE IT, AND HE HAD A PLAN TO SELL THE INFORMATION OUT AND

19 DISTRIBUTE THE INFORMATION FOR SOME TYPE OF PURPOSE. AND SO

20 THROUGH THE COURSE OF THE INVESTIGATION, IT WAS ELECTED TO

21 CONDUCT AN UNDERCOVER OPERATION TO CONFIRM THAT HE HAD THE

22 TELEPHONE, THE TELEPHONE NUMBER WAS STILL IN USE BY HIM, AND

23 THEN IT WENT TO HAVE HIM COME DOWN FOR US TO MEET HIM AND

24 CONDUCT THE INTERVIEW AND OBTAIN THE CELLULAR DEVICE FROM HIM.

25     Q.    YOU TESTIFIED YOUR PURPOSE FOR THE MEETING WAS NOT

1 TO ARREST HIM, CORRECT?

2     **A.**    CORRECT.

3     **Q.**    BUT, IN FACT, YOU DID HAVE AN ARREST WARRANT TO

4 SEARCH HIM, CORRECT?

5     **A.**    WE HAD A SEARCH WARRANT TO OBTAIN THE PHONE FROM

6 HIM, SO IF WE -- IF HE DID NOT COOPERATE AND DID NOT WANT TO

7 TURN OVER THE PHONE, WE HAD A SEARCH WARRANT THAT WAS GOING TO

8 ALLOW US TO OBTAIN THE PHONE FROM HIM.

9     **Q.**    AND THAT WARRANT SPECIFICALLY AUTHORIZED YOU,

10 THROUGH A WARRANT SIGNED BY RICH BOURGEOIS, TO SEARCH HIS

11 PERSON FOR THAT PHONE?

12     **A.**    YES, SIR, TO OBTAIN THE PHONE.

13     **Q.**    DID YOU COMMUNICATE THE FACT THAT YOU HAD A WARRANT

14 TO SEARCH HIS PERSON TO MR. HAMLETT?

15     **A.**    I DID SHOW HIM A COPY OF THE SEARCH WARRANT. BEFORE

16 WE ADVISED HIM OF THE SEARCH WARRANT FOR THE PHONE, WE ASKED

17 HIM FOR HIS COOPERATION ON TURNING OVER THE PHONE. HE TURNED

18 OVER THE PHONE TO US, AND HE SIGNED A CONSENT FORM CONSENTING

19 TO RELEASE THE FORM TO US.

20         AFTER WE DISCUSSED THE MATTER OUTSIDE OF HIS

21 PRESENCE, IT WAS DECIDED THAT WE WOULD GO AHEAD AND SERVE THE

22 SEARCH WARRANT TO HIM AND PROVIDE HIM THE SEARCH WARRANT DUE

23 TO THE FACT THAT HE MAY WANT TO COME BACK SHORTLY THEREAFTER

24 AND REQUEST THE PHONE BE RETURNED TO HIM, AND THAT WOULD END

25 THE CONSENT THAT HE HAD CONDUCTED TO US.

1       **Q.**    SO IF HE HAD REFUSED TO VOLUNTARILY PRODUCE THE

2 PHONE, WHAT WOULD YOU HAVE DONE?

3       **A.**    WE WERE GOING TO PROVIDE HIM WITH A SEARCH WARRANT,

4 AND WE WERE GOING TO OBTAIN THE PHONE.

5       **Q.**    AND, AGAIN, IF HE -- EXACTLY HOW WOULD YOU HAVE

6 OBTAINED THE PHONE IF HE WOULD HAVE REFUSED TO PRODUCE IT?

7       **A.**    WELL, WE DID HAVE AN OPERATIONAL PLAN IN PLACE, THAT

8 THERE WERE OTHER AGENTS WITHIN THE AREA. WE ASKED HIM FOR

9 CONSENT TO TURN OVER THE PHONE, AND WE WERE SEEKING HIS

10 CONSENT TO TURN OVER THE PHONE, BUT IF HE DID NOT RETURN --

11 TURN OVER THE PHONE, WE WOULD HAVE LOOKED TO DETAIN HIM FOR A

12 SECOND TO OBTAIN THE PHONE FROM HIM.

13       **Q.**    SO AT THE TIME HE ARRIVED AT THE HOTEL, HOW MANY

14 OFFICERS IDENTIFIED THEMSELVES TO HIM?

15       **A.**    MYSELF AND SPECIAL AGENT METHVYN, THAT WAS ALL.

16       **Q.**    BUT THERE WERE OTHER OFFICERS THAT WERE COVERT AND

17 WERE NOT IDENTIFIED TO HIM?

18       **A.**    YES, SIR. THERE WERE OTHER AGENTS THAT WERE WITHIN

19 THE HOTEL AND OUTSIDE THE HOTEL.

20       **Q.**    AND FROM YOUR PERSONAL KNOWLEDGE, YOU WOULD NOT KNOW

21 IF, BASED ON MR. HAMLETT'S TRAINING AS AN INVESTIGATOR, HE

22 WOULD HAVE BEEN AWARE OF THESE COVERT AGENTS SURROUNDING HIM?

23       **A.**    NO, SIR, I WOULD NOT.

24       **Q.**    NOW, YOU MENTIONED THAT HE WAS ALLOWED TO TAKE

25 BREAKS, CORRECT?

1    A.    YES, SIR.

2    Q.    AND BEFORE I GET INTO THAT LINE OF QUESTIONING, HOW

3    LONG WOULD YOU SAY THIS MEETING WAS?

4    A.    IT WENT ON, IT WENT OVER A FEW HOURS.  THE FIRST

5    BREAK WAS ROUGHLY AN HOUR, A LITTLE OVER AN HOUR INTO IT, AND

6    THEN WE WERE THERE PROBABLY FOR ANOTHER GOOD HOUR, A LITTLE

7    OVER AN HOUR FOR THE SECOND PART.

8    Q.    BUT HE HAD TO ASK PERMISSION TO TAKE A BREAK?

9    A.    WELL, HE ADVISED US IF HE -- WE TOLD HIM TO LET US

10   KNOW IF HE WANTED TO TAKE A BREAK.  HE WASN'T ASKED

11   PERMISSION, BUT IF HE WANTED TO STOP OR LET US GO TO THE

12   RESTROOM, WE ASKED HIM TO LET US KNOW.

13   Q.    AND WAS HE ALLOWED TO DO THIS UNACCOMPANIED BY ANY

14   AGENT OR OFFICER?

15   A.    YES, SIR.  WELL, WHEN HE WENT OUT TO THE CAR, THERE

16   WAS AN AGENT THAT WOULD HAVE WENT OUTSIDE WITH HIM FOR AN

17   OFFICER SAFETY PERSPECTIVE TO MAKE SURE THAT HE WASN'T GOING

18   TO GET SOME TYPE OF WEAPON OR COME BACK WITH SOMETHING OR GO

19   OUTSIDE AND GET SOME FRIENDS TO COME BACK IN OR SOMETHING OF

20   THAT NATURE.  SO SOMEBODY WOULD HAVE BEEN OUTSIDE OBSERVING

21   HIM WHAT HE'S DOING AT THAT TIME.

22   Q.    THAT MAKES ME THINK OF SOMETHING YOU HAD TESTIFIED

23   TO EARLIER.  YOU SAID THAT PART OF THE SUBTERFUGE FOR GETTING

24   HIM TO THE HOTEL WAS OFFICER SAFETY.  DO YOU REMEMBER

25   TESTIFYING TO THAT?

1    **A.**    YES, SIR.

2    **Q.**    AND SO IT IS YOUR THINKING THAT A HOTEL LOBBY FULL

3    OF PEOPLE WOULD HAVE BEEN BETTER FOR OFFICER SAFETY?

4    **A.**    WELL, WE SELECTED THAT PLACE BASED ON IT WAS A GOOD

5    ENVIRONMENT TO MEET WITH HIM.  IT WAS OPEN.  WE HAD A ROOM

6    THERE THAT WAS GOING TO BE AVAILABLE TO HAVE HIM COME UP TO

7    THE ROOM, AND WE WERE ABLE TO POSITION A NUMBER OF AGENTS

8    AROUND IN THE AREA THAT -- IN PLAIN CLOTHES THAT WOULD BLEND

9    IN WITH THE CROWD THAT WOULD NOT GIVE IT AN UNCOMFORTABLE

10   PRESENCE.

11   **Q.**    AT ANY TIME IN YOUR INTERVIEW WITH MR. HAMLETT, DID

12   YOU MAKE IT CLEAR TO HIM THAT YOU ALREADY KNEW THE ANSWERS TO

13   MANY OF THE QUESTIONS YOU WERE PUTTING TO HIM?

14   **A.**    I THINK AT SOME POINT SOME OF THE THINGS THAT HE

15   SAID WE CONFIRMED WITH HIS ANSWERS THAT HE HAD PROVIDED WITH

16   US.  IN REGARDS TO AT ONE POINT DURING THE INTERVIEW, FROM

17   WHAT I RECOLLECT, HE TALKED ABOUT THAT HE HAD MADE THE

18   ACCESSES AND THEN HE STOPPED FOR A PERIOD OF TIME TO GET

19   SOMETHING TO EAT, DINNER, THEN HE STARTED BACK, AND THEN HE

20   ATTEMPTED TO MAKE SOME ADDITIONAL ACCESSES, AND I THOUGHT THAT

21   WE HAD CONFIRMED POSSIBLY THAT THAT MATCHED UP WITH WHAT HE

22   HAD TOLD US OR WHATNOT.

23   **Q.**    AND DID YOU COMMUNICATE TO HIM THAT IT WOULD BE IN

24   HIS BEST INTEREST TO COOPERATE?

25   **A.**    WE ADVISED HIM THAT WE WERE SEEKING HIS COOPERATION,

1   AND HIS COOPERATION WOULD BE NOTED IF THERE WERE TO BE CHARGES

2   LATER DOWN THE ROAD.

3      Q.    SO CHARGES WERE MENTIONED DURING THIS INTERVIEW?

4      A.    WE ADVISED HIM THAT THERE WERE VIOLATIONS, THAT HE

5   HAD VIOLATED FEDERAL LAW, AND THAT WE WERE STILL COLLECTING

6   THE INFORMATION AND THAT THERE WAS THE POTENTIAL FOR CHARGES.

7      Q.    SO YOU ADVISED HIM THAT YOU HAD A WARRANT TO SEARCH

8   HIS PERSON; YOU ADVISED HIM THAT HE WAS THE SUBJECT OF AN

9   INVESTIGATION IN WHICH THERE WOULD BE CHARGES.  DID YOU ADVISE

10   HIM OF HIS *MIRANDA* RIGHTS?

11      A.    NO, SIR, I DID NOT ADVISE HIM OF HIS *MIRANDA* RIGHTS.

12   HE WAS NOT IN CUSTODY.  HE WAS FREE TO GO.

13      Q.    AS LONG AS ACCOMPANIED BY AN AGENT?

14      A.    HE WOULDN'T HAVE BEEN ACCOMPANIED BY AN AGENT.  IF

15   HE DECIDED THAT HE WAS GOING TO END AND LEAVE, HE WAS FREE TO

16   GO.

17      Q.    AND AT THAT POINT, YOU WOULD NOT HAVE EXECUTED THE

18   WARRANT YOU HAD TO SEARCH HIM?

19      A.    WE WOULD HAVE EXECUTED THE SEARCH WARRANT AT SOME

20   POINT TO OBTAIN THE PHONE, YES, SIR.

21      Q.    NOW, AS REGARDING THE E-MAIL OF OCTOBER 31, SPECIAL

22   AGENT, YOU JUST KNOW OF THE RECEIPT OF THE E-MAIL, YOU DO NOT

23   HAVE ANY PERSONAL KNOWLEDGE OF ANY COMMUNICATION BETWEEN MR.

24   HAMLETT OR ANY OTHER AGENT THAT WOULD HAVE PRODUCED THAT

25   E-MAIL?

1      **A.**   NO, SIR.  THE AGENT PROVIDED ME A COPY OF THE E-MAIL

2  SO I OBSERVED IT, BUT THE AGENT INDICATED TO ME THAT HE

3  RECEIVED IT.

4      **Q.**   AND THE THIRD INTERVIEW ON NOVEMBER 8, AT THAT POINT

5  WAS A -- HAD A CRIMINAL COMPLAINT BEEN OBTAINED?

6      **A.**   I WOULD HAVE TO LOOK BACK AT THE DATE, BUT I DON'T

7  RECOLLECT.  I WOULD HAVE TO SEE THE DAY OF THE INDICTMENT

8  FOR -- AT THAT POINT AT WHAT TIME IT WAS.  I WAS NOT INVOLVED

9  WITH THE INTERVIEW THAT TOOK PLACE ON NOVEMBER 8, AND I DON'T

10 RECALL THE SPECIFIC DAY THAT WE RECEIVED THE INDICTMENT.

11     **Q.**   ONE MOMENT, AGENT.

12     **A.**   YES, SIR.

13     **Q.**   WE ARE THROUGH WITH ALL OUR QUESTIONS.  THANK YOU.

14     **THE COURT:**  MR. SANCHEZ, [SIC] REDIRECT?

15               **REDIRECT EXAMINATION**

16 **BY MR. REZAEI:**

17     **Q.**   AS FAR AS THE UNDERCOVER AGENT, THAT UNDERCOVER

18 AGENT WAS -- THAT AGENT WAS USED SOLELY TO PROCURE THE

19 DEFENDANT'S PRESENCE AT THE EMBASSY SUITES?

20     **A.**   NO, SIR.

21     **Q.**   WHAT ELSE WAS IT USED FOR?

22     **A.**   INITIALLY, THE FIRST CONTACTS THAT WERE CONDUCTED

23 WITH MR. HAMLETT WERE TO CONFIRM THE USE OF THE PHONE, THE

24 CELLULAR DEVICE, AND THAT HE STILL ACTIVELY WAS ANSWERING THAT

25 PHONE AND STILL ACTIVELY USING THAT PHONE.  AND THAT -- IT WAS

1 USED TO ASSIST US IN PROBABLE CAUSE TO OBTAIN THE SEARCH

2 WARRANT FOR THE PHONE.

3     Q.    I GUESS WHAT I'M GETTING AT IS WAS THE NATURE OF THE

4 INVESTIGATION REVEALED TO THE DEFENDANT WHEN YOU MET HIM AT

5 THE EMBASSY SUITES?

6     A.    YES, SIR.  UPON HIM ENTERING THE EMBASSY SUITES,

7 WHEN WE APPROACHED HIM, WE APPROACHED HIM WITH OUR CREDENTIALS

8 IN HAND AND IDENTIFIED OURSELVES IMMEDIATELY TO HIM AT THAT

9 POINT.

10     Q.    I JUST WANT TO ADDRESS THE TIMELINE HERE OF THE

11 SEARCH WARRANT FOR THE PHONE.  HAD YOU OBTAINED HIS CONSENT TO

12 SEARCH HIS PHONE PRIOR TO REVEALING THE EXISTENCE OF THE

13 WARRANT?

14     A.    YES, SIR, WE HAD.

15     Q.    SO TO BE CLEAR:  HE DIDN'T KNOW ABOUT THIS WARRANT

16 UNTIL AFTER YOU ACTUALLY ALREADY OBTAINED HIS CONSENT?

17     A.    YES, SIR.  HE CONSENTED, SIGNED THE CONSENT FORM FOR

18 US TO SEARCH HIS PHONE, AND THEN WE STOPPED AND WE HAD A

19 DISCUSSION OUTSIDE OF HIS PRESENCE, AND IT WAS DECIDED THAT WE

20 WOULD GO AHEAD AND SERVE THE SEARCH WARRANT TO HIM FOR THE

21 FACT THAT HE COULD WITHDRAW HIS CONSENT, THEN THAT WOULD STOP

22 THE PROCESS, AND WE WOULD HAVE TO RETURN THE PHONE AT THAT

23 POINT.

24     Q.    AND TO BE CLEAR:  THIS WARRANT WE'RE TALKING ABOUT,

25 IT'S NOT AN ARREST WARRANT?

**A.** NO, SIR. IT'S A SEARCH WARRANT FOR THE CELLULAR TELEPHONE.

**Q.** AND THE DISCUSSION OF CHARGES, WHEN DID THAT TAKE PLACE DURING THE COURSE OF THE INTERVIEW?

**A.** IT WAS TOWARDS THE END OF THE INTERVIEW. WHEN HE WAS ASKING WHAT WAS GOING TO -- HE ASKED SOME QUESTIONS IN REGARDS TO WHAT WAS GOING TO HAPPEN NEXT. I HAD ADVISED HIM -- OR SPECIAL AGENT METHVYN -- I DON'T RECALL WHICH OF US ADVISED HIM SPECIFICALLY, BUT HE WAS ADVISED THAT THERE WAS POSSIBLE CRIMINAL VIOLATIONS THAT HAD OCCURRED, AND WE WERE CONDUCTING THE INVESTIGATION, AND THAT HE WAS ALSO ADVISED AT THAT TIME THAT THERE WAS A SEARCH WARRANT BEING EXECUTED AT HIS RESIDENCE WHERE HE WAS LIVING. WE ADVISED HIM OF ALL THAT, AND HE WAS ASKING OF -- EXCUSE ME -- POSSIBLE NEXT STEPS, THINGS OF THAT NATURE.

**Q.** BUT THAT REVELATION WITH RESPECT TO THE SEARCH WARRANT OF HIS RESIDENCE, AGAIN, WHEN DOES THAT TAKE PLACE DURING THE INTERVIEW?

**A.** THAT IS TOWARDS THE END OF THE INTERVIEW. WE ASKED HIM FOR A KEY TO HIS RESIDENCE, AND WE ADVISED HIM THAT THERE WAS AGENTS THERE THAT WERE GOING TO BE EXECUTING THE SEARCH WARRANT, AND IF HE HAD A KEY, THAT THAT WOULD BE HELPFUL. HE COULD PROVIDE THE KEY, AND WE COULD SEND IT -- WE HAD SOMEONE AVAILABLE THAT WAS GOING TO RUN THE KEY OVER TO THE RESIDENCE TO DROP IT OFF.

1      **Q.**    THANK YOU.

2         **MR. REZAEI:**   NOTHING FURTHER, YOUR HONOR.

3         **THE COURT:**   ALL RIGHT.   YOU MAY STEP DOWN, SIR.

4         **THE WITNESS:**   THANK YOU, SIR.

5              **(WITNESS EXCUSED.)**

6         **THE COURT:**   NEXT WITNESS.

7         **MR. REZAEI:**   AT THIS TIME THE UNITED STATES CALLS

8  SPECIAL AGENT JEFF METHVYN.

9              **(OFF-RECORD DISCUSSION.)**

10        (WHEREUPON, **GLENN JEFF METHVYN, JR.,** HAVING BEEN

11 DULY SWORN, TESTIFIED AS FOLLOWS.)

12        **THE COURT:**   GOOD AFTERNOON.

13             **DIRECT EXAMINATION**

14 BY MR. REZAEI:

15     **Q.**    WILL YOU PLEASE STATE AND SPELL YOUR NAME FOR THE

16 RECORD.

17     **A.**    MY NAME IS GLENN J. METHVYN, JR., THAT'S WITH TWO

18 N'S.   I GO BY JEFF.

19     **Q.**    WHO IS YOUR EMPLOYER?

20     **A.**    I WORK FOR THE FEDERAL BUREAU OF INVESTIGATION AS A

21 SPECIAL AGENT.

22     **Q.**    WHAT ARE YOUR DUTIES AS A SPECIAL AGENT?

23     **A.**    MY DUTIES INCLUDE INVESTIGATING VIOLATIONS OF

24 FEDERAL CRIMINAL LAW.

25     **Q.**    HOW LONG HAVE YOU BEEN A SPECIAL AGENT?

1     **A.**    I'VE BEEN A SPECIAL AGENT WITH THE FEDERAL BUREAU OF

2    INVESTIGATIONS SINCE AUGUST OF 1996, SO A LITTLE OVER TWENTY

3    YEARS.

4     **Q.**    DID YOU, ALONG WITH SPECIAL AGENT JOHNSON, INTERVIEW

5    THE DEFENDANT ON OCTOBER 27, 2016?

6     **A.**    YES, SIR, I DID.

7     **Q.**    WHAT WAS THE ATMOSPHERE OF THE CONVERSATION THAT

8    Y'ALL HAD?

9     **A.**    I WOULD DESCRIBE THE ATMOSPHERE OF THE CONVERSATION

10    AS CONGENIAL AND COOPERATIVE.

11     **Q.**    I MEAN, HOW COOPERATIVE WAS THE DEFENDANT DURING THE

12    INTERVIEW?

13     **A.**    HE WAS VERY COOPERATIVE.  WE ASKED HIM QUESTIONS; HE

14    ANSWERED.  HE ASKED QUESTIONS IN GENERAL, AND WE ANSWERED

15    THOSE AS WELL.  IT WAS VERY COOPERATIVE, CONVERSATIONAL.

16     **Q.**    WHY DON'T YOU COMPARE THIS INTERVIEW WITH OTHER

17    INTERVIEWS YOU HAVE HAD OVER THE COURSE OF YOUR CAREER?

18     **A.**    WITH REGARDS TO INTERVIEWS THAT RESULTED IN

19    ADMISSIONS, I WOULD CLASSIFY THIS ONE AS ONE OF THE ONES THAT

20    WAS VERY EASY TO OBTAIN AN ADMISSION FROM, FROM THE SUBJECT.

21     **Q.**    EXPLAIN WHAT MADE IT EASY.

22     **A.**    I THINK HE WAS BEING VERY COOPERATIVE AND WAS

23    TELLING US WHAT ACTUALLY OCCURRED.

24     **Q.**    WAS IT THE CASE THAT THE DEFENDANT WAS FREE TO LEAVE

25    AT ANY TIME?

1      **A.**    YES, HE WAS FREE TO LEAVE AT ANY TIME.

2      **Q.**    SO DID YOU OR SPECIAL AGENT JOHNSON ALLOW HIM TO

3 TAKE BREAKS, OR WAS THAT SOMETHING THAT HE WAS FREE TO DO ON

4 HIS OWN?

5      **A.**    HE WAS FREE TO DO THAT ON HIS OWN, TO TAKE BREAKS.

6      **Q.**    AS FAR AS THOSE BREAKS, WHERE WERE YOU WHEN THE

7 DEFENDANT TOOK THEM?

8      **A.**    DURING THE FIRST BREAK WAS A SMOKE BREAK, I BELIEVE

9 I STOOD OUTSIDE WITH HIM WHILE HE WAS SMOKING HIS CIGARETTE.

10     **Q.**    WHY DID YOU DO THAT?

11     **A.**    WELL, WE HAD INITIALLY ASKED HIM WHEN HE CAME IN

12 WHETHER OR NOT HE WAS ARMED, AND WE DID TAKE HIM AT HIS WORD

13 FOR IT, BUT I DIDN'T WANT HIM GOING OUTSIDE AND GOING INTO A

14 VEHICLE AND PERHAPS ARMING HIMSELF.  SO I WANTED TO BE THERE

15 WITH HIM AND CHAT WITH HIM, AND I WOULD SAY, YOU KNOW, THERE

16 WAS A LOT OF SMALL TALK THAT WENT ON DURING THE INTERVIEW, AND

17 SO I STOOD THERE WITH HIM WHILE HE SMOKED HIS CIGARETTE.

18     **Q.**    WHEN YOU SAY *SMALL TALK*, DESCRIBE JUST THE NATURE OF

19 THE SMALL TALK, AS FAR AS IT RELATES TO THE ATMOSPHERE.

20     **A.**    I ASKED HIM QUESTIONS ABOUT HIS PROFESSION AS A

21 PRIVATE INVESTIGATOR, WHAT TYPE OF CASES HE WAS INVOLVED IN,

22 WHAT, YOU KNOW, WHAT KIND OF LINE OF WORK HE DID.

23     **Q.**    AND AS FAR AS THE SECOND BREAK, WHAT DID YOU DO

24 DURING THAT TIME?

25     **A.**    I DON'T RECALL SPECIFICALLY, BUT I MAY HAVE WALKED

1 OUT WITH HIM TO HIS VEHICLE WHEN HE GOT LIKE A CHARGER FOR HIS

2 CELL PHONE.

3     Q.    AND DID HE SMOKE AT THAT TIME?

4     A.    I BELIEVE HE DID.  I'M NOT ONE HUNDRED PERCENT

5 CERTAIN.  HE CERTAINLY WOULD HAVE BEEN ALLOWED TO SMOKE.  IT

6 WAS NO BIG DEAL TO ME.

7     Q.    THAT'S ALL THE QUESTIONS I HAVE.

8     **THE COURT:**   CROSS?

9                     **CROSS-EXAMINATION**

10 BY MR. FISER:

11     Q.    GOOD AFTERNOON, SPECIAL AGENT METHVYN.

12     A.    YES, SIR.

13     Q.    MICHAEL FISER, NICE TO MEET YOU.

14     A.    NICE TO MEET YOU.

15     Q.    YOU TESTIFIED THAT HE WAS -- HE, MR. HAMLETT, WAS

16 VERY COOPERATIVE?

17     A.    YES, SIR.

18     Q.    YET HE DID NOT WANT TO ACCOMPANY YOU GENTLEMEN TO A

19 PRIVATE ROOM; IS THAT CORRECT?

20     A.    THAT'S CORRECT.

21     Q.    AT THE RISK OF ASKING FOR SPECULATION, DO YOU KNOW

22 WHY HE WOULD NOT ACCOMPANY YOU TO A PRIVATE ROOM?

23     A.    I DON'T KNOW WHY.  IT OBVIOUSLY DIDN'T CLASSIFY HIM

24 AS BEING NONCOOPERATIVE IN MY TRAIN OF THOUGHT.

25     Q.    YOU SAID IT WAS VERY EASY TO OBTAIN ADMISSIONS FROM

1  HIM DURING THIS INTERVIEW?

2      **A.**   YES, SIR.

3      **Q.**   AND WOULD YOU AGREE WITH ME IT'S EASY TO OBTAIN

4  ADMISSIONS WHEN AN ATTORNEY IS NOT PRESENT FOR THE CLIENT,

5  RIGHT?

6      **A.**   I WOULD SAY, I MEAN, I GUESS FOR ARGUMENT SAKE, I'M

7  SURE IT WOULD BE.  I DON'T THINK -- HE DIDN'T ASK FOR AN

8  ATTORNEY.

9      **Q.**   AND YOU-ALL CERTAINLY DIDN'T TELL HIM THAT HE MIGHT

10  NEED ONE?

11      **A.**   WE DID NOT PROVIDE HIM WITH HIS *MIRANDA* WARNINGS,

12  NO, SIR.

13      **Q.**   NOW, WERE YOU FAMILIAR WITH MR. HAMLETT FOR SOME

14  PRIOR CASES OR . . .

15      **A.**   I WAS FAMILIAR NOT NECESSARILY WITH HIM PERSONALLY.

16  WE HAD DONE A LITTLE BIT OF, I GUESS, OPEN SOURCE

17  INVESTIGATION.  WE KNEW THAT HE HAD BLOGGED ON A COUPLE OF

18  MISSING PERSON CASES, AND ONE OF THOSE PARTICULAR CASES, I WAS

19  PRETTY FAMILIAR WITH, NOT FROM A CASE AGENT PERSPECTIVE, BUT

20  FROM A -- JUST FOLLOWING THE CASE IN THE NEWS.

21      **Q.**   IS IT FAIR TO SAY SOME OF THE CONVERSATION YOU-ALL

22  MIGHT HAVE HAD WAS SMALL TALK ABOUT YOUR PRIOR HISTORY

23  TOGETHER OR FAMILIARITY WITH EACH OTHER?

24      **A.**   WITH SIMILAR CASES, ABSOLUTELY, THAT'S CORRECT.

25      **Q.**   WOULD IT BE UNFAIR FOR ME TO SAY THAT OR FALSE FOR

1  ME TO SAY THAT YOU SPOKE WITH HIM MORE THAN ANYONE ELSE
2  PRESENT?

3      A.    THAT WOULD PROBABLY BE CORRECT, PAR FOR THE COURSE.

4      Q.    AND HOW LONG WOULD YOU ESTIMATE THAT YOU SPOKE WITH
5  HIM?

6      A.    WITH REGARDING THE SMALL TALK, I WOULD SAY MORE SO
7  THAN -- I DON'T HAVE A TIMEFRAME, BUT CERTAINLY WITH THE SMALL
8  TALK, I WAS MORE INVOLVED IN JUST ENGAGING HIM WITH
9  CONVERSATION THAT WAS NOT PARTICULARLY ABOUT THE REASON WE
10 WERE THERE.  LIKE I SAID, FOR EXAMPLE, I THINK THE *MICKEY*
11 *SHUNICK* CASE AND THERE WAS ANOTHER MISSING PERSON CASE OUT OF
12 LAFAYETTE.

13     Q.    AND YOU WERE AWARE THAT THERE WAS A SEARCH WARRANT
14 THAT HAD BEEN OBTAINED TO SEARCH HIS PERSON, CORRECT?

15     A.    YES, SIR, I WAS.

16     Q.    WHAT WAS THE PLAN IF HE HAD JUST TURNED AROUND AND
17 SAID BYE, WHAT WOULD YOU-ALL HAVE DONE WITH THAT SEARCH
18 WARRANT?

19     A.    AS I UNDERSTAND IT, THE KEY WITH THE SEARCH WARRANT
20 WAS WE HAD TO SERVE IT WHEN WE HAD CAUSE TO BELIEVE HE HAD THE
21 PHONE ON HIM.  AND SO IF HE HAD WALKED IN WITHOUT US SEEING
22 ANY TYPE OF PHONE OR ANYTHING LIKE THAT AND WALKED BACK THAT
23 WOULD HAVE NOT TRIGGERED, SO WE WOULDN'T BEEN ABLE TO SERVE
24 HIM; HOWEVER, AT THE -- AS THE INTERVIEW CONTINUED, WE BECAME
25 AWARE THAT HE HAD THE PHONE IN HIS POSSESSION THROUGH THE

1  CONVERSATION, AND WE WOULD HAVE BEEN ABLE TO DO IT.  BUT RIGHT

2  AT THE VERY BEGINNING, I DON'T THINK THAT WOULD HAVE TRIGGERED

3  IT.

4      Q.   AND WHEN YOU SAID *HAD THE PHONE*, WAS IT A SPECIFIC

5  PHONE, OR JUST WERE Y'ALL INTERESTED IN ANY ELECTRONIC

6  COMMUNICATION DEVICE HE WOULD HAVE HAD ON HIS PERSON?

7      A.   I DON'T RECALL THE DETAILS OF THE SEARCH WARRANT.  I

8  KNEW THEM AT THE TIME.  IT WAS PROBABLY JUST ANY CELL PHONE,

9  BUT I DON'T RECALL THE DETAILS.  I WOULD -- IF I COULD LOOK AT

10  THE SEARCH WARRANT, I COULD PROBABLY TELL YOU.

11      Q.   ONE MOMENT.

12          NOTHING FURTHER.  THANK YOU.

13          THE WITNESS:  YES, SIR.

14          THE COURT:  ANY REDIRECT?

15          MR. REZAEI:  NO, YOUR HONOR.

16          THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN, SIR.

17                      (WITNESS EXCUSED.)

18          THE COURT:  YOUR NEXT WITNESS.

19          MR. REZAEI:  THE GOVERNMENT RESTS AT THIS TIME.

20          THE COURT:  MR. FISER?

21          MR. FISER:  YOUR HONOR, THE DEFENSE WOULD CALL

22  JORDAN HAMLETT.

23          (WHEREUPON, **JORDAN HAMLETT,** HAVING BEEN DULY SWORN,

24  TESTIFIED AS FOLLOWS.)

25          THE COURT:  GOOD AFTERNOON.

1    DIRECT EXAMINATION

2    BY MR. FISER:

3        Q.    MR. HAMLETT, WOULD YOU STATE YOUR FULL NAME?

4        A.    JORDAN HAMLETT.

5        Q.    WHERE DO YOU LIVE, JORDAN?

6        A.    IN BATON ROUGE, LOUISIANA.

7        Q.    HOW OLD ARE YOU?

8        A.    I'M 31.

9        Q.    WHAT DO YOU DO FOR A LIVING, JORDAN?

10       A.    PRIVATE INVESTIGATOR.

11       Q.    AND WERE YOU SO EMPLOYED BACK ON OCTOBER 27 OF LAST

12   YEAR?

13       A.    YES, SIR.

14       Q.    DO YOU REMEMBER SOMETHING HAPPENING ON OCTOBER 27

15   THAT BROUGHT YOU TO A CERTAIN HOTEL?

16       A.    I DO.   I HAD GOTTEN A CALL FROM SOMEONE WHO WANTED

17   ME TO DO AN INVESTIGATION ON THEIR HUSBAND.   IT WAS SOME SORT

18   OF DOMESTIC INVESTIGATION.   I HAD SPOKEN WITH THEM A COUPLE OF

19   TIMES BEFORE THAT, AND THEY WERE ARRANGING A MEETING FOR THAT

20   MORNING.

21       Q.    AND WAS THIS MEETING FOR THE PURPOSE OF BEING

22   RETAINED ON THE CASE?

23       A.    YES, IT WAS.

24       Q.    AND WHERE WAS THIS MEETING TO TAKE PLACE?

25       A.    IT WAS AT THE -- I BELIEVE IT WAS THE EMBASSY HOTEL,

1  THE EMBASSY SUITES.

2        Q.    WAS THIS A HOTEL YOU WERE FAMILIAR WITH?

3        A.    I'VE BEEN THERE ONCE OR TWICE BEFORE.  I KNEW THE

4  AREA SO, YEAH, I WAS KIND OF FAMILIAR WITH IT.

5        Q.    AND THIS PERSON HAD GIVEN YOU A NAME?

6        A.    YES.  I DON'T RECALL WHAT IT WAS BUT, YEAH, THEY HAD

7  GIVEN ME A NAME, AND WE HAD AGREED ON THE PRICES AND WHAT THE

8  CASE WAS ABOUT AND ALL OF THAT.

9        Q.    DID THEY GIVE ANY WAY TO IDENTIFY THEM WHEN YOU

10 ENTERED THE LOBBY?

11       A.    NO, THEY DID NOT.  I HAD TEXTED THEM WHEN I ARRIVED,

12 AND THAT WAS THE LAST TIME I HAD HEARD FROM THEM.  I BELIEVE

13 SHE HAD SAID SHE WOULD BE DOWN SHORTLY, AND THEN THAT WAS IT.

14       Q.    YOU ARRIVED AT THE HOTEL ALONE?

15       A.    YES.

16       Q.    IN YOUR OWN PRIVATE VEHICLE?

17       A.    YES.

18       Q.    WHAT HAPPENED UPON ENTERING THE LOBBY?

19       A.    I WAITED THERE FOR A SECOND, WAITING FOR THE CLIENT

20 TO COME DOWN, AND AS I KIND OF APPROACHED THE ATRIUM AREA,

21 THAT'S WHEN I SAW BOTH SPECIAL AGENTS KIND OF APPROACH ME AND

22 ADVISED WHO THEY WERE AND SAID THEY NEEDED TO SPEAK TO ME

23 ABOUT SOMETHING.

24       Q.    NOW, HOW MANY AGENTS DID YOU RECOGNIZE?

25       A.    JUST THE TWO.

1    Q.    DID YOU RECOGNIZE THAT THEY WERE ARMED?

2    A.    I COULDN'T TELL.   I JUST ASSUMED THAT THEY WERE

3   'CAUSE I COULD SEE THEIR BADGES, AND I KNOW I COULD SEE THE

4   CORNER OF HOLSTERS, AND IT'S DOING WHAT I DO FOR A LIVING, I

5   JUST ASSUMED THEY WERE ARMED WHEN THEY HAVE THEIR BADGES OUT.

6    Q.    AT THIS POINT, DID YOU HAVE AN EPIPHANY THAT YOU

7   WEREN'T GOING TO BE GETTING A NEW CLIENT THAT DAY?

8    A.    RIGHT.   THAT WAS WHEN IT STARTED TO DAWN ON ME.

9    Q.    AND WHAT WERE YOU TOLD?

10   A.    THEY HAD SAID THAT THEY HAD A SENSITIVE MATTER THEY

11  NEEDED TO TALK TO ME ABOUT AND SAID WE COULD GO UP TO A ROOM

12  IF HE WANTED OR WE COULD TALK DOWN THERE IN THE LOBBY.   SO

13  THAT WAS WHEN I SAT DOWN THERE WITH THEM IN THE LOBBY AREA,

14  AND THEY BEGAN ASKING ME ABOUT -- IT WAS JUST KIND OF ASKING

15  ME ABOUT WHAT I DO AND THINGS LIKE THAT AT FIRST.

16   Q.    DID THEY INDICATE THAT THEY WERE INTERESTED IN YOU

17  AT THIS POINT?

18   A.    NOT IMMEDIATELY, NO.   THEY WERE JUST MAKING SMALL

19  TALK FOR A LITTLE WHILE SORT OF, AS YOU HAD MENTIONED, ABOUT

20  LIKE CASES I HAVE WORKED AND THINGS I DO LIKE THAT.   BUT THEN

21  IT SLOWLY STARTED TO COME UP WHEN THEY SAID ONE OF THE REASONS

22  THEY WERE THERE, THAT WAS IT -- THEY ADVISED THAT IT WAS

23  REGARDING ME, YEAH.

24   Q.    DO YOU REMEMBER THEM ASKING FOR YOUR PHONE?

25   A.    I BELIEVE THEY HAD ASKED FOR IT OR ASKED IF I HAD IT

1  ON ME OR IF THEY COULD SEE IT, SOMETHING LIKE THAT.  I DON'T

2  RECALL EXACTLY WHAT THEY HAD SAID.

3      Q.    DID YOU ULTIMATELY GIVE THEM YOUR PHONE?

4      A.    YES, I DID.

5      Q.    WHY DID YOU DO THAT?

6      A.    BECAUSE I ASSUMED I KIND OF HAD TO AT THAT POINT.  I

7  WAS DOING WHATEVER THEY WERE TELLING ME TO DO.

8      Q.    WERE YOU AFRAID?

9      A.    I WAS AFRAID I WAS GOING TO JAIL, THAT WAS --

10     Q.    YOU DID NOT FEEL FREE TO LEAVE?

11     A.    OH, NO, ABSOLUTELY NOT.  I WAS UNDER THE IMPRESSION

12  AS SOON AS WE WERE DONE TALKING, I WAS GOING TO JAIL.

13     Q.    WHAT GAVE YOU THAT IMPRESSION?

14     A.    JUST, I MEAN, I HAD TWO FEDERAL AGENTS TALKING TO ME

15  DOWN THERE, AND ABOUT THE THINGS THEY WERE TALKING TO ME

16  ABOUT, AND THEN IT REALLY SUNK IN WHENEVER -- I BELIEVE I HAD

17  GONE TO GET THE CHARGER OUT OF MY CAR FOR THE PHONE, AND ONE

18  OF THE AGENTS SORT OF CUT ME OFF AND WAS LIKE, NO, NO, NO AND

19  BACKED ME UP, AND HE WENT INTO MY CAR AND GOT IT FOR ME.  AND

20  THEY WERE LIKE, YEAH, WE CAN'T -- 'CAUSE IT WAS TWO THAT

21  ACCOMPANIED ME THERE.

22          AND THEN WHENEVER I SAT OUTSIDE SMOKING A CIGARETTE,

23  HE SAT AND WAITED WITH ME FOR -- AS I WAS WALKING BACK TO THE

24  HOTEL, I STOPPED TO SMOKE AND HE WAITED OUT THERE WITH ME FOR

25  ME TO FINISH, AND THAT'S WHEN I REALIZED LIKE, OKAY, I CAN'T

1  GO ANYWHERE AND --

2      **Q.**    WHAT DID YOU THINK WOULD HAPPEN IF YOU JUST GOT UP

3  AND GOT IN YOUR CAR?

4      **A.**    THAT I WOULD BE IN A HIGH SPEED CHASE ON THE NEWS IF

5  I JUST LEFT LIKE THAT.

6      **Q.**    WAS THERE ANY TALK ABOUT A WARRANT FOR YOU OR YOUR

7  PROPERTY?

8      **A.**    I DON'T RECALL.  I BELIEVE THEY JUST SAID THEY HAD

9  A WARRANT.  THEY HADN'T REALLY SPECIFICALLY SAID THAT IT WAS

10  FOR MY PHONE OR FOR -- THEY HAD JUST SAID THAT THEY HAD A

11  WARRANT AND THAT THEY ADVISED ME THEY HAD A WARRANT TO SEARCH

12  MY RESIDENCE TOO, AND THAT THEY HAD AGENTS OVER THERE ABOUT TO

13  DO A RAID ON MY HOUSE.

14      **Q.**    AS THEY WERE SPEAKING WITH YOU, THEY SAID AGENTS

15  WERE ABOUT TO RAID YOUR HOUSE?

16      **A.**    CORRECT.

17      **Q.**    DID AGENTS RAID YOUR HOUSE?

18      **A.**    YES, THEY DID.

19      **Q.**    DID THEY POLITELY USE YOUR KEY THAT YOU HAD PROVIDED

20  OR --

21      **A.**    NO.  WE HAD -- I HAD TRIED INFORMING THEM THAT THE

22  DOOR WAS EITHER UNLOCKED OR THEY HAD A KEY UNDER THE MAT, BUT

23  THEY DECIDED TO KICK THE DOOR IN OR BOOT THE DOOR IN, TOO.

24      **Q.**    AND ALL OF YOUR PROPERTY, COMPUTERS WERE SEIZED?

25      **A.**    CORRECT, ALL OF MINE AND MY GIRLFRIEND AND HER WORK,

1    WHICH IS FOR THE LOUISIANA WILDLIFE FEDERATION.  ACTUALLY,

2    MOST OF THE STUFF THERE WAS PROPERTY OF THE LOUISIANA WILDLIFE

3    FEDERATION, AND ALL THAT WAS SEIZED TOO.

4        Q.    DID YOU FEEL LIKE YOU NEEDED A LAWYER AT THIS TIME

5    DURING THE INTERROGATION?

6        A.    OH, ABSOLUTELY.  BUT IT'S KIND OF THE PRESSURE IN

7    THAT SORT OF A SITUATION, I WAS JUST KIND OF CAUGHT OFFGUARD

8    AND REALLY DIDN'T KNOW KIND OF WHAT TO DO.

9        Q.    AND YOU WERE CERTAIN IN YOUR MIND THAT YOU WERE

10   UNDER ARREST?

11       A.    I THOUGHT I WAS, YES.  I WAS UNDER NO IMPRESSION

12   THAT I COULD JUST GET UP AND LEAVE.

13           MR. FISER:  WE TENDER, YOUR HONOR.

14           THE COURT:  MR. SANCHEZ.

15           MR. REZAEI:  IT'S ALL RIGHT, YOUR HONOR.

16           THE COURT:  RYAN, LONG AFTERNOON.

17                       CROSS-EXAMINATION

18   BY MR. REZAEI:

19       Q.    MR. HAMLETT, HOW LONG HAD YOU BEEN A PRIVATE

20   INVESTIGATOR?

21       A.    SINCE MARCH OF 2008, SO ABOUT NINE YEARS NOW.

22       Q.    AND AS A PRIVATE INVESTIGATOR, YOU ACTUALLY HAVE HAD

23   DISCUSSIONS WITH THE FEDERAL BUREAU OF INVESTIGATION?

24       A.    I HAVE.  CORRECT.

25       Q.    AND THAT OCCURRED PRIOR TO THE INTERVIEW ON THIS

DATE?

    A.    YES.

    Q.    AND YOU HAVE HAD CONVERSATIONS WITH OTHER LAW ENFORCEMENT AUTHORITIES, INCLUDING THE SHERIFF'S OFFICE, CORRECT?

    A.    CORRECT.

    Q.    THAT OCCURRED BEFORE OCTOBER 27, 2016?

    A.    YES, SIR.

    Q.    WHEN YOU MET SPECIAL AGENT JOHNSON AND METHVYN, YOU WERE ASKED WHETHER OR NOT YOU WANTED TO BE IN A PRIVATE ROOM OR BE DOWN IN THE LOBBY AREA/ATRIUM AREA?

    A.    YES.

    Q.    AND YOU CHOSE TO SIT IN THE LOBBY/ATRIUM AREA?

    A.    CORRECT.

    Q.    YOU CHOSE NOT TO GO INTO THE PRIVATE ROOM?

    A.    CORRECT.

    Q.    THE AGENTS NEVER TOUCHED YOU ASIDE FROM SHAKING YOUR HAND?

    A.    NO SIR, THEY DIDN'T.

    Q.    THEY NEVER HANDCUFFED YOU?

    A.    NO.

    Q.    THEY DIDN'T CHAIN YOU TO A CHAIR?

    A.    NO, THEY DIDN'T.

    Q.    THE CHAIR WASN'T CHAINED TO THE FLOOR?

    A.    NO.

Q.    AND THERE WEREN'T ANY LOCKED DOORS OBSTRUCTING YOUR
ABILITY TO LEAVE?

A.    NO.

Q.    I BELIEVE YOU TESTIFIED THAT YOU WERE AFRAID,
DURING THE COURSE OF YOUR INTERVIEW, OF BEING ARRESTED?

A.    CORRECT.

Q.    YOU NEVER ASKED ONE WAY OR THE OTHER IF YOU COULD
LEAVE THE INTERVIEW?

A.    WELL, WHENEVER I COULDN'T EVEN REACH INTO MY CAR TO
GET MY CHARGER, I WAS UNDER THE ASSUMPTION I COULDN'T GET IN
IT TO LEAVE EITHER.  IT WAS KIND OF THE SAME THING.

Q.    ALL RIGHT.  SO YOU HAD TAKEN TWO -- YOU HAD STOOD UP
AND LEFT THE INTERVIEW AREA TWICE?

A.    WELL, I'D ASKED THEM IF I COULD, YES.

Q.    SO YOU ASKED THEM IF YOU COULD GO?

A.    RIGHT.

Q.    SO YOU ASKED THEM TO GET UP THE FIRST TIME AND GO
OUTSIDE?

A.    CORRECT.

Q.    AND YOU ACTUALLY GOT UP FROM YOUR CHAIR?

A.    YES, SIR.

Q.    AND THEN YOU WALKED UP THE STAIRS?

A.    CORRECT.

Q.    YOU CHOSE TO WALK THROUGH THE LOBBY?

A.    CORRECT.

Q.   YOU CHOSE TO GO OUTSIDE?

A.   WHICH, I MEAN, THAT'S THE ONLY WAY -- THAT WAS THE ONLY ENTRANCE AND EXIT FROM THAT AREA, BUT YEAH, THAT'S CORRECT.

Q.   BUT THAT'S WHAT YOU CHOSE TO DO?

A.   WELL, I MEAN, NORMALLY I WOULDN'T ASK FOR PERMISSION TO DO IT, I WOULD JUST GO OUTSIDE.

Q.   AND YOU'RE THE ONE WHO MADE THE DECISION TO TAKE OUT YOUR PACK OF CIGARETTES?

A.   CORRECT.

Q.   YOU WERE THE ONE TO DECIDE TO SMOKE THAT CIGARETTE?

A.   YES, SIR.

Q.   YOU ARE THE ONE WHO HAD THE WHOLE CIGARETTE?

A.   YES, SIR.

Q.   AND AFTER THAT YOU DECIDED YOU WOULD COME BACK IN?

A.   CORRECT.

Q.   AND YOU DID DECIDE TO COME BACK IN?

A.   YES.

Q.   AND YOU DID WALK BACK IN?

A.   YES.

Q.   AND YOU DIDN'T ASK, HEY, CAN I GO NOW AT THAT POINT?

A.   WELL, NO, 'CAUSE LIKE I SAID, I DIDN'T THINK I COULD.

Q.   AND YOU DIDN'T ASK THAT AT ANY POINT DURING THE COURSE OF THE INTERVIEW?

1    A.    NO.

2    Q.    BUT YOU'VE BEEN A PRIVATE INVESTIGATOR FOR NINE

3  YEARS AT THAT POINT, RIGHT?

4    A.    YES, SIR.

5    Q.    SO YOU WERE AWARE YOU COULD DO THAT IN THAT

6  SCENARIO, RIGHT?

7    A.    THAT'S CORRECT, WHICH KIND OF ESTABLISHES JUST HOW

8  CAUGHT OFF-GUARD I WAS AND HOW MUCH PRESSURE OR HOW IT FELT AT

9  THE TIME OF THE FACT THAT ME, SOMEONE WHO'S USED TO THAT, I

10 FELT LIKE I COULDN'T GO AND IT KIND OF -- LIKE I SAID, IT

11 CAUGHT ME OFF-GUARD EVEN SO . . .

12   Q.    I WANT TO TALK ABOUT THIS SEARCH WARRANT OF YOUR

13 RESIDENCE.  NOW, THAT DIDN'T COME UP 'TIL THE END OF YOUR

14 INTERVIEW?

15   A.    CORRECT.  IT WAS AROUND THE SAME TIME WHEN THEY TOLD

16 ME THEY HAD A WARRANT.  THEY HAD SAID THEY ALSO HAD ONE FOR MY

17 HOUSE.

18   Q.    AND YOU WERE ASKING QUESTIONS ABOUT THOSE WARRANTS?

19   A.    I DON'T REMEMBER WHAT I HAD ASKED THEM ABOUT THAT,

20 OR IF I HAD ASKED ANYTHING ACTUALLY.  I DON'T RECALL IF I HAD

21 OR NOT.

22   Q.    SO YOU CONTINUED TO HAVE MORE CONVERSATIONS WITH THE

23 AGENTS AFTER YOUR FIRST SMOKE BREAK?

24   A.    CORRECT.

25   Q.    DO YOU DISPUTE THE AGENTS' TESTIMONY THAT YOU WERE

1   ACTUALLY VERY COOPERATIVE DURING THE COURSE OF -- IN FACT, THE

2   ENTIRE INTERVIEW?

3       **A.**     NO, I DON'T DISPUTE THAT. LIKE I SAID, I WAS

4   ANSWERING ALL THEIR QUESTIONS.

5       **Q.**     YOU WERE BEING COOPERATIVE?

6       **A.**     YES, SIR.

7       **Q.**     AND THEY WERE POLITE TO YOU THE WHOLE TIME?

8       **A.**     POLITE, I MEAN, IT'S INTIMIDATING, BUT IT'S, I MEAN,

9   STILL POLITE.

10       **Q.**     SO THEY WERE POLITE?

11       **A.**     RIGHT.

12       **Q.**     THEY WERE COURTEOUS AT ALL TIMES?

13       **A.**     YES.

14       **Q.**     THEY DIDN'T RAISE THEIR VOICES AT ANY POINT?

15       **A.**     NO.

16       **Q.**     THEY DIDN'T PUT THEIR HANDS ON YOU AT ANY POINT?

17       **A.**     THE AGENT STOPPING ME FROM GETTING IN MY CAR DID,

18   BUT THAT WAS -- HE WAS THE ONLY ONE.

19       **Q.**     ALL RIGHT. AT NO OTHER POINT DID SPECIAL AGENT

20   JOHNSON OR METHVYN PUT THEIR HANDS ON YOU AT ANY POINT?

21       **A.**     NO, THEY DIDN'T.

22       **Q.**     AT NO POINT DID THEY SAY, NO, YOU HAVE TO STAY HERE?

23       **A.**     NO, THEY DIDN'T.

24       **Q.**     IN FACT, YOU ASKED TO GET UP AND GO TAKE A SMOKE

25   BREAK?

1    A.    UH-HUH.

2    Q.    IS THAT A YES?

3    A.    YES, SIR.

4    Q.    THANK YOU VERY MUCH.   THAT'S ALL.

5          THE COURT:   ANY RECROSS OR REDIRECT, MR. FISER?

6          MR. FISER:   NO RECROSS, YOUR HONOR.

7          THE COURT:   ALL RIGHT.   YOU MAY STEP DOWN, MR.

8    HAMLETT.

9          ALL RIGHT.   YOUR NEXT WITNESS.

10         MR. FISER:   THE DEFENSE WOULD REST, YOUR HONOR.

11         THE COURT:   ALL RIGHT.   IS THERE ANY REBUTTAL?

12         MR. REZAEI:   NO REBUTTAL, YOUR HONOR.

13         THE COURT:   ALL RIGHT.   GENTLEMEN, WILL YOU NEED A

14   TRANSCRIPT?

15         MR. REZAEI:   I MEAN, IF WE ARE GOING TO DO BRIEFING,

16   I ALWAYS REQUEST A TRANSCRIPT.

17         MR. FISER:   WE WOULD LIKE ONE, YOUR HONOR.

18         THE COURT:   ALL RIGHT.   THE GOVERNMENT WILL HAVE

19   TWENTY DAYS FROM THE DATE OF THE FILING OF THE TRANSCRIPT TO

20   FILE A MEMORANDUM.   THE DEFENDANT WILL HAVE TWENTY DAYS

21   THEREAFTER.   IT DOES NOT NEED TO BE EXTENSIVE, BUT GIVE ME

22   YOUR THOUGHTS.

23         MR. REZAEI:   UNDERSTOOD.   THANK YOU.

24         THE COURT:   ALL RIGHT.   ANYTHING ELSE?

25         MR. REZAEI:   NOTHING FURTHER.

1          **MR. FISER:**  THANK YOU, JUDGE.

2              **(WHEREUPON, THIS MATTER WAS CONCLUDED.)**

3                  C E R T I F I C A T E

4          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

5    FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

6    NUMBERED MATTER.

7    _Shannon Thompson_____

8    SHANNON L. THOMPSON, CCR

9    OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25